## AINSA v. UNITED STATES.

APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 429. Argued October 25, 28, 1895. — Decided March 2, 1896.

In order to the confirmation of a Mexican grant by the Court of Private Land Claims, it must appear not only that the title was lawfully and regularly derived, but that, if the grant were not complete and perfect, the claimant could, by right and not by grace, have demanded that it should be made perfect by the former government, had the territory not been acquired by the United States; and by the treaty no grant could be considered obligatory which had not been theretofore located.

The grant under which the plaintiff in error claims was a grant of a specific quantity of land, to wit: seven and a half sitios and two scant caballerios within exterior boundaries, and not a grant of the entire eighteen leagues contained within those exterior boundaries; and as location was a prerequisite to any action by the Court of Private Land Claims, and as the grant had not been located at the date of the Gadsden treaty, it cannot be confirmed.

THIS was a proceeding on behalf of the United States, instituted by direction of the Attorney General, in the Court of Private Land Claims, under the third clause of section eight of the act of March 3, 1891, c. 539, 26 Stat. 854. The petition alleged that defendants were asserting a claim to the premises in dispute under an alleged Mexican land grant by virtue of the treaty of December 30, 1853, known as the " Gadsden Purchase," and that the title of defendants and each of them was open to question in several particulars set out in the petition. And it was prayed that the defendants be notified to

show cause why the alleged grant should not be declared null and void, and that the title to said land might be quieted and forever settled, and for general relief.

Separate answers were filed by Santiago Ainsa, administrator of Frank Ely, and by Juan Pedro Camou and George H. Howard. Defendants admitted that they claimed the land as tenants in common, and each set up and pleaded his title and asked confirmation of his claim. The New Mexico and Arizona Railroad Company claimed its right of way under them.

The answer of Camou and Howard stated among other things:

" That, as appears and is shown from and in the said official survey, the minutes whereof are contained in the aforesaid testimonio, the form of the same was nearly square, the northern and southern boundaries conforming, of necessity, angularly with those of the Casita Rancho and the Tumacacori and Calabasas tracts ; that within the bounds, natural objects, and monuments set forth and established by the said official survey, there is an excess of about —, more or less, some 4631 hectaras, 21 aras, and 47 centiaras, or about — of such said excess, surplus, or demasias, being in that portion of grant lying and being in the State of Sonora, all of which is set forth and shown in the resurvey of the grant and plot thereof had and made A. D. 1886, by the Mexican government upon the petition of your petitioner, Camou, to purchase the said demasias that lay within the Republic of Mexico; which said resurvey and plot thereof and the proceedings thereon, as well as the final sale and grants by the said Republic of Mexico — petitioner Camou of the said demasias within the said republic, and a final recognition, expressly considered and given, of the aforesaid original grant of —, made A. D. 1843 by the treasurer general of the department of Sonora, are contained, shown, and set forth in the duly authenticated original testimonio, which was made and delivered unto the said Camou by the said republic as complete and final evidence of title, a copy of which is filed herein and herewith, marked as ' Exhibit B.' " .

Camou also filed an amended answer, which alleged that

the tract in question had been duly located and recorded in the archives of Mexico, prior to the twenty-fifth of September, referred to in article VI of the Gadsden treaty, and that his grantors and predecessors in interest, who were the owners of the grant at the time of the adoption of the treaty of Guadaloupe Hidalgo and of the Gadsden treaty, were Mexicans and citizens of the Republic of Mexico, and further alleged that the validity of the grant was examined into by the United States surveyor general for Arizona, who made a report thereon, a certified copy whereof, dated February 25, 1881, was made part of his answer. This report states that the grant was "for the exact quantity of seven and one half square leagues and two short caballerias, notwithstanding the petition was for the vacant land lying between the northern boundary of Casita and the western boundary of rancho Tumacacori;" that the survey "fixed the quantity at exactly seven and one half square leagues and two short caballerias;" and that "after survey every act in the proceedings up to and including the formal execution of the grant was upon the basis of the exact quantity ascertained by survey." The surveyor general called attention to the importance attached by the Mexican government to the quantity or area of grants of land as shown by the action of the procurator fiscal, hereinafter referred to, in correcting the error of the appraisers in omitting to value the two short caballerias, which, being done, "the grant was executed for the definite quantity heretofore stated." In his opinion, as the petition showed that the petitioner wanted the vacant land bounded on the south by the Casita and northerly by the Calabazas without special reference to other boundaries, the claim should be made to bind those ranchos with the easterly and westerly lines so established as to include exactly seven and one half square leagues and two caballerias, and he recommended confirmation of so much of the claim as should be found in Arizona on a survey made as thus indicated.

Upon the trial the court ruled that the object of the proceeding by the government was simply to bring in the parties in order that the claimants' title might be confirmed if it were

found that their grant was valid; that, moreover, the defendants had prayed for such confirmation; and that the burden of proof was upon the defendants. They thereupon offered in evidence a titulo of the land in question, entitled "Title to seven and one half sitios and two short caballerias of land for raising cattle and horses, contained in the vacant public lands between the north boundary of the ranch of Casita and the west boundary of the mission of Tumacacori and Calabazas, in the upper Pima country, issued to Don José Elias and his parents, Don Francisco Gonzales and Doña Balvanera Redondo, residents of the town of Imuris." From this it appeared, although the petition is not in the record, that May 6, 1841, Don José Elias and his parents applied "for the resurvey of the lands of the ranch of Casita, of which they are the owners and possessors, and which are situated in the jurisdiction of the town of Imuris, and also for the survey, appraisement, and publication of the vacant public lands which they say they need." This part of the application is also described in the proceedings as being "for the survey, appraisement and publication, offer and sale of seven and one half sitios and two short caballerias of land for raising cattle and horses, which comprise the vacant public lands situated between the north boundary of the ranch of Casita and the west boundary of the mission of Tumacacori and Calabazas, in the upper Pima country, in the district of San Ignacio." The application was granted by the superior board of the treasury of the department of Sonora, May 22, 1841, and a resurvey of the ranch Casita was ordered, as also a survey of the public lands sought to be purchased, and the order directed that separate expedientes should be made of both operations. This action of the board was certified to the superior chief of the treasury, May 26, 1841, who on that day commissioned Don Francisco Navamuel to make the surveys. He was directed to resurvey for Don José Elias and his parents the lands of Casita, "giving them the area or number of sitios that legally belong to them, with due separation of the sitio or sitios that result in excess within the lawful boundaries of said lands of Casita. And at the same time said com-

missioner shall execute, in separate expedientes, the proper survey, appraisement, and publication of the vacant public lands the parties in interest apply for, after the indispensable judicial information which said commissioner, under his own strictest responsibility, shall cause to be taken before a competent judge and shall aggregate to the original proceedings, and which shall be that of three impartial, capable and upright witnesses of practical intelligence, by which it is legally and sufficiently proved that the parties in interest need such vacant public lands and have an abundance of stock to stock them with." The commissioner was required to act in strict compliance with the laws of Sonora of May 20, 1825, and July 11, 1834, and to adjust the sitio or sitios contained in the lands of Casita; their overplus, if any ; and the vacant public lands, strictly by the regulations, giving to each sitio the area of twenty-five million square varas, and he was cautioned as soon as the operations as to the excess or overplus resulting within the lawful boundaries of Casita were completed, that that excess should not be published, but appraised in accordance with article 2 of decree No. 51 of May 12, 1835. The commissioner procured evidence that Gonzales and his wife had four thousand head of cattle more or less, and proceeded to resurvey the ranch of Casita, and then to survey the vacant public lands. As to this survey he reported that he started at the north cross monument of Casita and directed himself "along the public road that goes toward the north to the presidio of Tubac," 340 cords, (17,000 varas,) "which ended on the high road, in a flat, where a wide canyon that comes down from the slope of the Pajarito mountains terminates," where he ordered a monument placed, "that of Calabazas being about a thousand steps further on on a high hillock which slopes down on the other side of said canyon." " Having asked the party how he wanted the land squared, he replied that he wanted twenty cords to the east; and thereupon they were measured for him twenty-two (22) cords from the monument which is in the high road, in a straight line guided by the compass, to a hillock that has many oak trees on its slope, and on the summit a pile of stones was placed as

a monument." Having returned to the cross monument on
the high road, the commissioner measured west fifty cords,
(twenty-five hundred varas,) where he "reached very broken
ground, which it was impossible to measure with the cord,"
when he "made a scrupulous estimate, together with my
assistants, of one hundred and fifty cords, until I arrived to
where the Pajarito mountains turned to the north near the
place they call Calaveras, said Pajarito mountains having been
crossed and within the land surveyed, and there I ordered the
party to place a pile of stones as a corner monument." He
then returned to the place of beginning, and measured east
twenty-two cords, (eleven hundred varas,) "which ended
upon some hillocks at the trunk of an oak tree, where a pile
of stones was placed," and from the same point he measured
and estimated "in several stretches of rough ground, towards
the west, two hundred (200) cords, which ended on a whit-
ish ridge that has considerable pasture, near the so called
Planchas de Plata, which ridge divides the streams that flow
towards the ranch of Agua Caliente and those that go towards
Agua Zarca. Thus the south boundary was closed with
another two hundred and twenty-two (222) cords and is
limited there by the ranch of Casita. In this manner was
terminated the survey of the vacant public lands, which in-
clude seven and one half sitios, and the party, when it was
made known to him, was satisfied and understood the area
it encloses, and was warned to place, at the first opportu-
nity, fixed monuments of stone and mortar." The land was
then appraised, according to the state law of Sonora, at the
minimum price of fifteen dollars per sitio, the amount being
put at one hundred and twelve dollars, four reals; and publi-
cation was ordered in accordance with that law for thirty con-
secutive days, by the public crier, "in solicitation of bidders
who may make a better valuation." The last publication was
on December 10, 1841, when proceedings were suspended, on
account of the absence of Don José Elias, until November 28,
1842, when they were referred, as required by the law of
Sonora, to the attorney general of the treasury, who reviewed
the same, and reported thereon that the survey was 340 cords

from the north to the south and 222 cords from east to west, which, reduced to varas, and multiplied, gave 188,700,000 square varas, making "seven and one half sitios and two caballerias, a little short, for raising cattle;" that the appraisement made no account of the two short caballerias, which were of the value of five reals ten grains at the rate of fifteen dollars per sitio, for which reason the total value should be one hundred and thirteen dollars, one real and ten grains; and recommended a sale " of said seven and one half sitios and two short caballerias of public land for raising cattle and horses, included between the north boundary of the ranch of Casita and the west boundary of the mission of Tumacacori and Calabazas," to the highest bidder on three public offers. This was so ordered January 5, 1843, and after three public offers, January 5, 6, and 7, sale was made to Don José Elias and his parents. The description of the land offered was in these words: "There are going to be sold, on account of the public treasury of the department, seven and one half sitios and two short caballerias of land for raising cattle and horses, contained in the vacant public lands situated between the boundaries of Casita and those of the mission of Tumacacori and Calabazas, in the upper Pima country." In the third publication the translation uses, instead of the words "contained in the vacant public lands," the words "comprising the vacant public lands," and this difference of phraseology appears in several of the proceedings, that is, sometimes the seven and one half sitios are described as contained in the vacant public lands, and sometimes as comprising the vacant public lands. The documents in Spanish were not sent up.

The titulo then recites the receipt of one hundred and thirteen dollars, one real and ten grains, and that in the provisional memorandum book of receipts for the current year the receipt of that sum, "being the value of seven and one half sitios and two short caballerias of land for raising cattle and horses, contained in the vacant public lands between the boundaries of Casita and those of the mission of Tumacacori and Calabazas, in the upper Pima country," was entered. Thereupon the treasurer of the department of

Sonora, at Arizpe, on January 7, 1843, executed the grant as follows: "Therefore, by virtue of the authority which the laws, regulations and superior orders that govern in the matter confer on me, by these presents, in the name of the Mexican nation, I grant, in due form of law, seven and one half sitios and two short caballerias of land for raising cattle and horses, contained in the vacant public lands situated between the boundaries of Casita and those of the mission of Tumacacori and Calabazas, in the upper Pima country, in the district of San Ignacio, to Don José Elias, and to his parents, Don Francisco Gonzales and Doña Balvanera Redondo, residents of the town of Imuris, in said district, to whom I cede, give and adjudicate said lands, by way of sale, and with all the requisites, stability and permanence the laws establish, for themselves, their children, heirs and successors, etc."

Appended to the titulo appeared the following certificate signed by the chief clerk, which was offered in evidence by the defendants as a part thereof: "By supreme resolution of this day, the adjudication of the land referred to in the title issued on the 7th of January, 1843, is approved, under the provisions of article 3 of the law of December 3, 1855, and it is therefore legally confirmed. And in witness thereof and for the purposes that may be necessary this indorsement is made in the department of public works, in Mexico, on the 7th of July, 1886."

A memorandum was introduced in evidence, showing that the Toma de Razon or record book of land titles of Sonora contained an entry that on January 7, 1843, there was issued a title of grant for seven and one half sitios and two short caballerias of land for breeding cattle and horses, contained in or comprising the vacant public-lands, situated between the north boundaries of ranch La Casita and the western boundary of the mission of Tumacacori and Calabazas, in favor of Don José Elias and his parents. It was admitted that certain field notes and a plat thereto attached were made in December, 1891, by a surveyor, now deceased, named Oury, and that, if living and present, he would testify that said field notes and plat contained a survey of the claim according to

the natural objects and other descriptions contained in the original survey; the total area being 78,868.34 acres, of which 25,899.09 were in the United States. These field notes and map were introduced in evidence.

The testimony on behalf of the United States tended to show that by accurate measurement commencing at the north cross monument of the ranch, La Casita, and measuring north along the Tubac road three hundred and forty cords of fifty varas each, the measurement would terminate in the Republic of Mexico three and fifty-four hundredths cords, something over four hundred and twelve feet, south of the line between Mexico and the United States; and that according to Oury's survey there were within the exterior boundaries named in the titulo and within the boundaries of Mexico twelve and twenty-one hundredths sitios, or about 52,969.25 acres, and within the exterior boundaries and within the United States five and ninety-six hundredths sitios, making in the aggregate eighteen and seventeen hundredths sitios within the exterior boundaries, or 78,868 acres, and that seven and one half sitios contained 32,744 acres.

There was also evidence to the effect, as sufficiently stated by counsel for the United States, that none of the monuments referred to in the titulo are now in existence, and that the monuments now found on the southern boundary of the grant, being the south cross monument, the southeast monument and the southwest monument, have been recently constructed and are new monuments; that the so-called north cross monument consists of a mound of earth and pebbles about eighteen inches high and ten or twelve feet in diameter, on top of which is a stone eleven or twelve inches square, on which is marked " N de E N X," and has not the appearance of being a monument, but appears more like an ant hill, and about twenty steps from this is a similar mound, except the stone; and that the northeast monument is a recently constructed pile of stone, without mortar, about four feet in diameter, built in circular shape; that the southwest corner is not where it ought to be as described by the titulo, and that no such place as " Calaveras," named as one of the calls for the northwest corner, was known in that part of the country.

The United States also offered in evidence a transcript of the expediente referred to in the answer of Camou and Howard, being the same proceedings resulting in the order of July 7, 1886, a certificate of which was indorsed on the titulo and introduced in evidence by all of the defendants.

From these proceedings it appeared that on August 11, 1882, Don José Camou, Jr., through whom defendants Camou and Howard and others claimed, presented to the district judge at Hermosillo a petition alleging that he was a Mexican citizen, and that he was the owner of the ranch known as Los Nogales de Elias, situated on the boundary line of Mexico and the United States, between the ranches " La Casita," " Tumacacori," and " Calabazas," the overplus of which he denounced and sought to purchase under article eight of a general law of July 22, 1863, " with the understanding that if the other co-proprietors of said ranch of ' Nogales ' desire to share in this overplus, I do not object that the adjudication may be made in favor of all the owners thereof in the proportion to which they are entitled, provided they contribute to the expenses of the same." On August 17, 1882, it was ordered by the district judge of Sonora that the denouncement above referred to be admitted, and citizen Rosas was appointed as commissioner with instructions to resurvey the ranch called Los Nogales de Elias for the overplus so applied for, and he was required to report the true area of the ranch and the overplus of the same, if any, and was required to proceed under the law of July 20 and August 2, 1863. It was further recited that Rosas, in compliance with the order of the district judge, notified the parties in interest and the owners of the adjoining lands, and proceeded to a resurvey of the ranch according to its exterior boundaries as described in the titulo of the grant, and found within such exterior boundaries and monuments an excess within the Republic of Mexico of 4631 hectares, 21 ares, and 47 centiares, (or 2.64 sitios, being 11,443.73 acres,) over and above the seven and one half sitios sold in 1843. The report of this survey was made to the district judge and by him referred to the chief of the treasury acting as attorney general, who advised that said excess be adjudicated to José Camou,

Jr., subject to the approval of the board of public works, to which the matter was referred. That board required further explanation of the survey, which was made by Rosas on January 15, 1886, and thereafter the district judge was directed to suspend " approval of the adjudication until it becomes known whether or not it prejudices the growing town of Nogales, and likewise until the validity and legality of the title under which it is pretended to hold said ranch is established," in respect of which there was reason to entertain doubt, because the titulo of ownership issued to Don José Elias in the city of Arizpe by the departmental treasurer of Sonora, January 7, 1843, disclosed the fact " that the origin of the property or the original title was vicious and null, as the sale was made and the title issued by a departmental treasurer, and in the year 1842, when the bases of Tacubaya were in force, that is, when the national government was not only central but dictatorial, which two circumstances give the title in question the character of manifest nullity."

The objections appear to have been obviated, among other things, by securing from the President of the Republic of Mexico the order of July 7, 1886, already referred to, and the whole matter being again remitted to the district judge the surplus was regularly adjudicated to José Camou, Jr., who paid therefor the value, fixed at $555.74, and costs.

The Court of Private Land Claims held that under the original proceedings the right of the grantees was limited to the specific amount of land mentioned in the proclamation of sale and the grant; that the grant was for a specific quantity, and by its express language the quantity was made the controlling matter of the description; and that the intent of the granting officer to reserve to the government the excess over the amount granted within the boundaries was as clearly manifested as it could have been made by a reservation in express language. And that even though a grant such as the court held this to be was unknown to the Mexican law, still, what was actually effected was to be determined by the language made use of, and that the power of the officers to do what they did do need not be inquired into; that while a

parallelogram 340 cords in height and 222 cords in width, measured from the point designated by the commissioner as the cardinal point of survey, would be partly within the Territory of Arizona and partly within the State of Sonora, yet that the grant was specific as to quantity but not as to location, and the only effect of the proceedings was to designate certain boundaries within which the quantity of lands granted was to be located; that, of necessity, the location was to be determined by subsequent action, but no action was ever taken. The conclusion was that, at the time of the treaty of cession, the grant had not been located within the meaning of that instrument, and hence by its express terms could not now be recognized as of any validity; and that it was not such a grant as by the terms of the treaty the United States was bound to recognize and confirm, which by the terms of the act creating the court was the test of the rights of the parties.

The Court of Private Land Claims entered a decree "that the defendants, or either or any one of them, take nothing by their claim of lands lying north of the international boundary line between the United States and Mexico; and that the claims of the various defendants as made in their answers are hereby declared without merit and are disallowed." From this decree an appeal was prosecuted to this court.

Some definitions and explanations may properly be added to the foregoing statement.

A vara equals 32.9927 inches; a cordel, 137.95 feet, or 50 varas; a sitio contains 4338.464 acres; a caballeria, 105.75 acres; a hectare, 2.471 acres; a "sitio de ganado menor," or sheep ranch, 1928.133 acres. An expediente is a complete statement of every step taken in the proceedings, and a testimonio is the first copy of the expediente. A grant of final title papers is attached to the testimonio and delivered to the grantee as evidence of title, and entry is made at the time in a book called the Toma de Razon, which identifies the grantee, date of the grant and property granted. The dictionaries define " Tomar razon," "to register, to take a memorandum of, to make a record of a thing," and "Toma de Razon," "memorandum book."

The " Gadsden Purchase " added a strip along the southern boundary of the Territory of New Mexico, and Arizona was detached and made a separate Territory in 1863, within which strip and Territory the land in controversy is situated.

*Mr. Rochester Ford* for appellants.

*Mr. Solicitor General*, *Mr. Matthew G. Reynolds*, and *Mr. Luman F. Parker* for appellees.

Mr. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court:

As remarked in *Astiazaran* v. *Santa Rita Mining Co.*, 148 U. S. 80, 81, a case involving title to the ranchos of Tumaca- cori, Calabazas, and Huevavi, undoubtedly private rights of property within ceded territory are not affected by the change of sovereignty and jurisdiction, and are entitled to protection, whether the party had the full and absolute owner- ship of the land or merely an equitable interest therein, which requires some further act of the government to vest in him a perfect title. And this is so by the law of nations, "with or without any stipulation to such effect," *Strother* v. *Lucas*, 12 Pet. 410, 436, but when stipulations exist, the terms in which the high contracting parties have expressed themselves are to be observed.

By Article VIII of the treaty of Guadaloupe Hidalgo, Feb- ruary 2, 1848, Mexicans, established in territories previously belonging to Mexico and remaining for the future within the limits of the United States, as defined by the treaty, were free to continue where they then resided or to remove at any time to the Mexican Republic, " retaining the property which they possess in said territories, or disposing thereof, and removing the proceeds wherever they please;" and " in the said terri- tories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected. The present owners, the heirs of these, and all Mexicans who may here- after acquire said property by contract, shall enjoy, with re-

spect to it, guaranties equally ample as if the same belonged to citizens of the United States." 9 Stat. 922, 929.

Article VI of the Gadsden treaty, December 30, 1853, is as follows: "No grants of land within the territory ceded by the first article of this treaty, bearing date subsequent to the day — twenty-fifth of September — when the minister and subscriber to this treaty on the part of the United States, proposed to the government of Mexico to terminate the question of boundary, will be considered valid or be recognized by the United States, or will any grants made previously be respected or be considered as obligatory, which have not been located and duly recorded in the archives of Mexico." 10 Stat. 1031, 1035.

The difference in language between the two treaties is readily seen. Grants previous to the cession, which have not been located, are by the terms of the latter treaty not to be respected or considered as obligatory, as matter of right, whatever the United States might see fit to do, as matter of grace, under particular circumstances. And grants which have not been located would seem manifestly to be grants of a specific quantity of land within exterior boundaries containing a larger quantity. This was a familiar class of Mexican grants, and is referred to by Mr. Justice Field in *Hornsby* v. *United States*, 10 Wall. 224, 232, where, delivering the opinion of the court, he said: "As we have had occasion to observe in several instances, grants of the public domain of Mexico, made by governors of the department of California, were of three kinds: 1st, grants by specific boundaries, where the donee was entitled to the whole tract described; 2d, grants by quantity, as of one or more leagues situated at some designated place, or within a larger tract described by outboundaries, where the donee was entitled out of the general tract only to the quantity specified; and, 3d, grants of places by name, where the donee was entitled to the tract named according to the limits, as shown by its settlement and possession, or other competent evidence. The greater part of the grants which have come before this court for examination have belonged to the second class."

The mode in which private rights of property may be se-cured, and the obligations imposed upon the United States by treaties fulfilled, belongs to the political department of the government to provide. In respect to California, this was done through the establishment of a judicial tribunal, but in respect of the adjustment and confirmation of claims under grants from the Mexican government in New Mexico and in Arizona, Congress reserved to itself, prior to the passage of the act of March 3, 1891, c. 539, creating the Court of Private Land Claims, 26 Stat. 854, the determination of such claims, enacting as to New Mexico "that the surveyor general for the territory, under the instructions of the Secretary of the Interior, should ascertain the origin, nature, character and extent of all such claims, and for this purpose might issue notices, summon witnesses, administer oaths and do all other necessary acts; and should make a full report on such claims, with his decision as to the validity or invalidity of each under the laws, usages and customs of the country before its cession to the United States; and that his report should be laid before Congress for such action thereon as might be deemed just and proper, with a view to confirm *bona fide* grants, and to give full effect to the treaty of 1848 between the United States and Mexico." *Astiazaran* v. *Santa Rita Mining Company, supra;* act of July 22, 1854, c. 103, § 8, 10 Stat. 308, 309. And similarly, as to the surveyor general of Arizona, by the act of July 15, 1870, c. 292, 16 Stat. 291, 304.

As to the claim in question, this officer made the report attached to one of the pleadings, but the claim was never confirmed. An authentic survey and final determination of the location and boundaries of such claims was contemplated in any event. *Stoneroad* v. *Stoneroad,* 158 U. S. 240. Then came the passage of the act of March 3, 1891, repealing the prior acts and creating the court whose decree is now under review.

By the first subdivision of section thirteen of this act it is provided that: "No claim shall be allowed that shall not appear to be upon a title lawfully and regularly derived from the government of Spain or Mexico, or from any of the States

·of the Republic of Mexico having lawful authority to make grants of land, and one that if not then complete and perfect at the date of the acquisition of the territory by the United States, the claimant would have had a lawful right to make perfect had the territory not been acquired by the United States, and that the United States are bound, upon the principles of public law, or by the provisions of the treaty of cession, to respect and permit to become complete and perfect if the same was not at such date already complete and perfect." Here, again, there are significant differences between this phraseology and that used in the act of March 3, 1851, c. 41, "to ascertain and settle the private land claims in the State of California," 9 Stat. 631, which provided that the board of commissioners thereby created, the district court, and this court, in deciding on the validity of any claim brought before them, should "be governed by the treaty of Guadaloupe Hidalgo, the law of nations, the laws, usages and customs of the government from which the claim is derived, the principles of equity, and the decisions of the Supreme Court of the United States, so far as they are applicable," that is, the decisions theretofore given in relation to titles in Louisiana and Florida, which were derived from the French or Spanish authorities previous to the cession to the United States. *Fremont* v. *United States*, 17 How. 542, 553.

But, under the act of March 3, 1891, it must appear, in order to the confirmation of a grant by the Court of Private Land Claims, not only that the title was lawfully and regularly derived, but that, if the grant were not complete and perfect, the claimant could, by right and not by grace, have demanded that it should be made perfect by the former government, had the territory not been acquired by the United States, and by the treaty no grant could be considered obligatory which had not been theretofore located.

It is contended on behalf of the United States that this grant was void because the departmental officers had no power, under the laws of Mexico in force when it purported to be made, to make it without the approval of the supreme government, which it is not claimed had been given; and also, if

otherwise valid, that confirmation could not be accorded because the evidence failed to show that it was duly recorded in accordance with the requirements of the Mexican laws; but we need not enter upon the consideration of either of these propositions, since, assuming that this was a valid grant made by the proper officers and duly recorded, we concur with the court below that it was the grant of a specific quantity of land and not of the entire eighteen leagues contained within the exterior boundaries, and not having been located at the date of the treaty could not be confirmed.

It is to be noted that the petition of Don José Elias does not appear in the expediente, and its nonproduction is nowhere accounted for. The recitals in other parts of the proceedings as to the contents of such a petition were not considered in *United States* v.. *Cambuston*, 20. How. 59, 63, as conclusive or even satisfactory evidence of that fact; and appellants' argument treats the exact terms of the application as of importance, since they insist it was a petition for all the vacant public lands between the north boundary of Casita and the west boundary of Tumacacori and Calabazas. But the most that can be claimed is that the petition was for seven and one half sitios, as what was needed for the cattle of Don Elias and his parents, and that Don Elias may have assumed that that number of sitios covered all the vacant lands. And as, in our judgment, the expediente shows that what was directed to be appraised, what was appraised, what was directed to be sold, what was sold, what was paid for, and what purported to be granted, was seven and one half sitios and two short caballerias, while the alleged preliminary survey indicated general boundaries containing over eighteen sitios, we think, as the Court of Private Land Claims did, that the grant was of seven and a half sitios and two scant caballerias within exterior boundaries, and that location was a prerequisite to any action by the court.

Appellants insist that the grant of a certain quantity of land situated at some designated place, or within a larger tract described by outboundaries, was not known to the "State of the West," made up of Sonora and Sinaloa, and reference is made

to certain laws of May 20, 1825, and of July 11, 1834, as showing that lands in that State were to be surveyed before they were sold, and sold by metes and bounds as surveyed. The order of the superior board of the treasury of the department, set forth in the expediente, required compliance with the provisions of the law of July 11, 1834, and also with the regulations for surveying lands for raising cattle and horses made under the law of May 20, 1825, and as to any overplus within the lawful boundaries of Casita, required it not to be published but appraised in conformity with article 2 of decree No. 51 of May 12, 1835.

Article 30 of the law of 1825 provided that the owners of sitios should place at their boundary termini monuments of stone and mortar " as soon as possession thereof is given them ; and if within three months from the date the survey is concluded they do not do so," that a fine should be exacted from them and monuments ordered constructed at their expense. Article 63 of the law of 1834 was to the same effect, and read : " It is the duty of owners of sitios to place upon the boundary lines of their estates, landmarks of stone as ordered by the statutes, as soon as they are in possession of their estates ; and if within three months counting from the date that they receive their title, they have not complied with this regulation, they shall incur a penalty of twenty-five dollars, which they shall pay to the judge for the public funds, and moreover shall cause the said landmarks to be constructed at the cost of said proprietors."

And it is said that in Sonora, (and as respects lands acquired under the Gadsden treaty,) when public lands were parted with, the transaction constituted an executed contract of purchase rather than a grant. Conceding that the boundaries mentioned in these laws are not outboundaries but specific boundaries, they are boundaries ascertained by authentic survey of specific tracts taken possession of as so delineated, and it does not follow that these proceedings were anything more than the Court of Private Land Claims found them in effect to be, namely, a grant of a specific quantity of land, which was to be afterwards located.

Compliance with decree No. 51 of Sonora of May 12, 1835, with reference to the overplus in La Casita was required, as we have said, and moreover, the review of the proceedings by the attorney general of the treasury states that the commissioner proceeded "to the resurvey of the ranch of Casita, from which there resulted within this property the same nine sitios the original surveyor, José Olave, measured and estimated on the 20th day of April, 1742, and nine million two hundred thousand square varas more, which do not make half a sitio, and, even if they had reached that fraction, they should not be considered as overplus, under the provisions of the last clause of article 2 of decree No. 51 of the 12th of May, 1835, of the old State, and which is still in force."

That article is as follows:

"ARTICLE 2. Those are likewise 'bona fide' owners who, under the descriptions given in their records of survey, occupy some excess of land; and they are entitled to such excess, even after such excess is shown, without any other requirement than that of paying for the excess in accordance with the quality of land and the price which prevailed when the land was measured and appraised; and only in case the owner does not want the excess, or when such excess is very great in the opinion of the government, upon the report of the treasury, shall such excess be awarded to any one denouncing or soliciting it; and such person shall bear the expense of the resurvey, if the excess has not been ascertained. In lands measured by calculation, (graduacion,) none shall be regarded as excess that does not exceed half a sitio."

It thus appears that the resurvey of grants was provided for to ascertain the excess over the quantity intended to be granted, that unless the excess was more than half a sitio it might be disregarded, and that if it exceeded that, the owner of the original grant might be allowed to take it at the valuation. The application of Don José Elias was for a resurvey of the Casita in order that he might obtain the overplus lands therein on an appraisal, whereas if that ranch had been acquired by purchase *ad corpus*, that is to say, all the lands included by certain metes and bounds, possession delivered

and monuments set up, it is not apparent how the necessity for having a resurvey could have existed; and so when in 1882 and 1886, the Mexican government was applied to by defendant Camou, under the law of July 22, 1863, his application proceeded upon the theory that the grant under consideration was a grant of a specific quantity within exterior limits, and what he sought and was accorded was an adjudication of the overplus on paying the value thereof " in conformity with the tariff in force at the time of the denouncement."

Certain articles of the law of July 22, 1863, treat of the ascertainment and disposition of excesses where the indicated boundaries are supposed to cover only a certain quantity of land which, when resurveyed, turns out to be much larger than as described in the titles; and such resurveys had been practised from an early day and were recognized by Don Elias himself in his application in respect of La Casita. Royal Decree, Oct. 15, 1754, sect. 7, Reynold's Span. & Mex. Land Law, 54; Law of July 11, 1834, chap. 9, sect. 3, Id. 187; Law of July 22, 1863, Hall's Mex. Law, 174.

In any view, whether treated upon the principles applicable to a voluntary grant or as a purchase and sale, appellants' contention that Don Elias and his parents took all the public lands north of Casita as one tract by metes and bounds could be sustained only on proof of a determination of such metes and bounds by actual survey and delivery of possession accordingly.

Navamuel was instructed to survey seven and one half sitios of the vacant public lands " situated between the north boundary of the ranch of Casita and the west boundary of the mission of Tumacacori and Calabazas," and to measure the land between the north boundary of one tract and the west boundary of another may be supposed to involve considerable difficulty. However, it is said that the mission of Tumacacori and Calabazas lay north of these lands, and the surveyor general of Arizona was of opinion that the claim should bind the ranchos of Casita and Calabazas, " with the easterly and westerly lines so established as to include exactly seven and one half square leagues and two caballerias." The proceedings

show that Navamuel understood that the sale was not to be of a particular tract for a sum in gross, but of a specific number of sitios at the upset price fixed by the appraisal of those sitios, and that he was not to survey the whole of an existing tract, but to delineate a tract containing the desired number of sitios. With that understanding he apparently attempted, partly by measurements and partly by conjecture, to survey a parallelogram of 340 cordels by 222 cordels, which would contain seven and one half sitios, running a little over, and so far from intending to include all the public lands, he consulted the party "as to how he wanted the land squared," that is, the land to come to him, and acted on his reply.

Appellants deny that Navamuel laid out a parallelogram containing seven and a half sitios, and insist that instead he designated the boundaries of a tract containing all the public lands, being somewhat over eighteen sitios. They say that the northwest and southwest corners were arrived at partly by estimation; that the height of the grant as described was 449.82 cords and not 340 as stated; and that the distance from the north cross monument to the northwest corner was over 470 cords instead of 200. Navamuel did not visit the western boundary, and the southwest corner as claimed seems on the evidence not to be where that corner should be according to the titulo. As to the northwest corner, Oury, in December, 1891, could find no place called Calaveras and no monument 200 cords west of the north cross monument, but as he did find an old monument of loose rock four hundred and seventy odd cords west at Calabazas pass, and because of Navamuel's reference to the Pajarito mountains in that connection, he concluded to accept that monument as the northwest corner; in other words, he fixed on a point twelve and a half miles west as the point Navamuel placed at five miles and a fraction. We fear that these speculations did injustice to Navamuel, but we think they make it quite clear that to apply the rules of metes and bounds to the entire tract of vacant public lands is quite inadmissible when taken with the other facts and circumstances.

In common law conveyances the words "more or less,"

while sometimes having practically no effect, are frequently added to prevent the precise quantity named from being conclusive on the parties, and may operate to make a sale of land one in gross instead of by the acre, but the bare fact that Navamuel estimated a portion of his measurements was not equivalent to stamping "more or less" on the transaction or rendering the specified quantity not of its essence.

So monuments control courses and distances, and courses and distances control quantity, but where there is uncertainty in specific description, the quantity named may be of decisive weight, and necessarily so if the intention to convey only so much and no more is plain.

These considerations need not be elaborated nor the common law cases cited examined, inasmuch as we are of opinion on this record that the number of sitios specifically named was controlling.

How much land was appraised and sold and paid for? The minimum price at which the land could be appraised and sold was $15 per sitio. The price paid was at that rate for exactly seven and one half sitios and two caballerias. The commission to the appraisers was for the appraisement of seven and one half sitios; the appraisement was for seven and one half sitios; the procurator fiscal in his review of the proceedings pointed out that the appraisers had erred in taking no account of the two short caballerias, which he valued at five reals and ten grains, raising the total value from $112.50 to $113.15; the order for publication of notice referred to "the sitios surveyed for Don José Elias and Don Francisco Gonzalez" as "having now been appraised;" and the notices published were for the sale of "seven and one half sitios and two short caballerias of land appraised at $113, 1 real and 10 grains." The order striking off and selling the property to the purchasers, after reciting the assembling of the board, stated that the crier having announced that the seven and one half sitios and the two short caballerias of land were to be sold, and that thereupon the agent of Don José Elias and his parents came forward and again offered the one hundred and thirteen dollars, one real and ten grains, for which the land was

appraised, continued, "and the midday hour of twelve having sounded, for the last time the crier said: 'Going once, twice, three times; sold, sold, sold; may it do much good, good, good, to Don José Elias and his parents, Don Francisco Gonzalez and Doña Balvanera Redondo.' In these terms this act was terminated, and there was publicly and solemnly sold the seven and one half sitios and two short caballerias of land for raising cattle and horses, comprising the vacant public lands situated between the boundaries of Casita and those of the mission of Tumacacori and Calabazas in the upper Pima country, in the jurisdiction of the town of Imauris, for the sum of one hundred and thirteen dollars, one real and ten grains, in which they were appraised." It is true that in the translation before us the words "comprising the vacant public lands" are used, while in other parts of the proceedings the specified quantity is described as "contained in" or "comprised in" the vacant public lands, as for instance in the execution of the grant the words are "contained in the public lands." But we do not think this difference, in translation, or if existing in the original, can operate to make this an appraisement, advertisement, and sale of all the public lands north of Casita, no matter what their extent, but that these proceedings and the grant were plainly an appraisement, advertisement, sale, purchase, and grant of the specific quantity of seven and one half sitios and two caballerias scant. It is certain that the officers had no authority and did not intend to sell 78,868 acres for the purchase price of 32,744 acres; that in all the proceedings the transaction was limited to seven and one half sitios; that Navamuel determined what was needed by Elias as a cattle breeder, made his survey, approved the appraisement, and published for bids at "a better valuation," on that basis; and that the Mexican government has construed the grant in the same way in ordering a resurvey, and thereupon adjudicating the excess over seven and one half sitios.

This brings us to consider whether juridical possession was delivered to the grantee as asserted by appellants.

In *United States* v. *Pico*, 5 Wall. 536, 539, where there was

a concession by specific boundaries, and the words "in extent twelve square leagues" were added to the resolution of approval of the departmental assembly after the description of the tract ceded, it was held that these words did not create a limitation on the quantity granted, as they were evidently not used for any such purpose, but merely indicated a conjectural estimate of the quantity, and Mr. Justice Field observed that "when, in Mexican grants, boundaries are given, and a limitation upon the quantity embraced within the boundaries is intended, words expressing such intention are generally used," and that in case of doubt as to the intention to cede all the land within the designated boundaries, the doubt would be removed by the juridical possession delivered to the grantees, which "proceeding involved an ascertainment and settlement of the boundaries of the lands granted by the appropriate officers of the government specially designated for that purpose, and has all the force and efficacy of a judicial determination."

In *Malarin* v. *United States*, 1 Wall. 282, 289, Mr. Justice Field, again speaking for the court, in setting forth the act of juridical possession described in the expediente in that case, said: "Under the civil, as at the common law, a formal tradition or livery of seizin of the property was necessary. As preliminary to this proceeding the boundaries of the quantity granted had to be established, when there was any uncertainty in the description of the premises. Measurement and segregation in such cases, therefore, preceded the final delivery of possession. By the Mexican law various regulations were prescribed for the guidance in these matters of the magistrates of the vicinage. The conditions annexed to the grant in the case at bar required the grantee to solicit juridical possession from the proper judge. In compliance with this requirement, within four months after the issue of the grant, he presented the instrument to the judge of the district, and requested him to designate a day for delivering the possession. The judge designated a day, and directed that the adjoining proprietors be cited, and that measurers and counters be appointed. On the day designated the proprietors appeared,

and two measurers and two counters were appointed, and sworn for the faithful discharge of their duties. A line provided for the measurement was produced, and its precise length ascertained. The measurers then proceeded to measure off the land, the judge and the proprietors accompanying them. The measurement being effected, the parties went to the centre of the land, and there the judge directed the grantee to enter into the possession, which he did, and gave evidence of the fact ' by pulling up grass and making demonstration as owner of the land.' Of the various steps thus taken, from the appointment of the day, until the final act of delivery, a complete record was kept by the judge, and by him transmitted to the grantee after being properly entered upon the ' book of possessions.' "

In *Moore* v. *Steinbach*, 127 U. S. 70, 80, the grant required the grantee to " petition the proper judge to be put in juridical possession by him in virtue of this document, by whom the boundaries shall be marked out, on the limits of which he shall place the proper landmarks. The land now granted is of the extent of four square leagues, more or less, as shown by the map which accompanies the expediente. The judge who shall give him possession shall have it measured in conformity with the evidence, the surplus that results remaining in the nation for its proper use." This requirement of the grant was not complied with, and this court said : " The grantees were not invested with such title, and could not be, without an official delivery of possession under the Mexican government, and such delivery was not had, and could not be had, after the cession of the country, except by American authorities acting under a law of Congress."

Appellants' counsel contends that " the juridical possession of ' said seven and one half sitios and two short caballerias of land, comprising the vacant public lands between the boundaries of Casita and those of Tumacacori and Calabazas,' was, on January 7, 1843, the date of the grant, delivered by Ignacio Lopez, the treasurer general of the department of Sonora, in the presence of the two witnesses, Antonio Teran y Peralta and Joaquin Urias, to the grantees, in pursuance of the sur-

vey made November 24, 1841, and following days, in the presence of Marcello Bonilla, the coterminous owner, by which survey the land was segregated from the public domain."

But Ignacio Lopez was not a judicial officer, and had no authority to perform a judicial act; neither Lopez nor the attending witnesses nor the grantees were, on the seventh of January, 1843, upon the land, nor anywhere near it, but were at the city of Arizpe; the coterminous proprietors were none of them then called to give assent to the final act investing the grantees with title and possession, and there was, of course, no physical act on the part of the grantees accepting or taking possession of the grant. The attempt of counsel is to make out the act of juridical possession by reference to the date of the survey, which was more than a year before the land had been sold, bought, and paid for; nor was there at that time any pretence of the formal delivery of possession if it could have been done by anticipation. The application, it will be remembered, was for a resurvey of Casita, as well as for a survey of the public land sought to be acquired, and it appears from the expediente that the mission of Tumacacori and Calabazas was represented by Don Marcelo Bonilla on that occasion. And Navamuel also says that " in this manner was terminated the survey of the vacant public lands, which include seven and one half sitios, and the party, when it was made known to him, was satisfied and understood the area it encloses and was warned to place, at the first opportunity, fixed monuments of stone and mortar." But it still remained for the property to be sold and purchased, and possession to be taken, and though the applicant had the preference at the price fixed by the appraisement, a higher bid would have taken the property.

Nor are we prepared to accede to the suggestion that because, in the final execution of the grant, the purchasers were cautioned " to restrict and limit themselves to the land, holdings, metes and bounds particularly described in the hereinbefore inserted proceedings of survey," and to comply with the law as to monuments at their boundary termini, therefore it is to be inferred that the act of juridical possession

had already taken place though not disclosed by Navamuel's report.

The seven and one half sitios could undoubtedly have been located, juridical possession delivered, and monuments of stone and mortar put up, and the grantees would then have been limited to their metes and bounds thus ascertained; but the grantees did not do this, and, so long as these public lands remained in Mexico, were liable on resurvey to account for the excess over what they actually bought on such terms as the government imposed.

We have referred to the proceedings of 1882, 1886, in Mexico as furnishing persuasive evidence of the proper construction of this grant under Mexican law, and it may be further observed that the adjudication of the overplus required the location of the seven and a half sitios, which location Mexico, as the granting government, assumed it had the right to make, and made, out of the land within its jurisdiction. In this way the grant was satisfied by the receipt of all that the grantees had bought and were entitled to under the Mexican law, the result as to the overplus enuring to Camou's cotenants by the terms of his petition.

In any view no reason is perceived for disregarding the construction thus put upon the titulo, and as the land purchased was not located at the date of the cession, the United States were not bound by the treaty to recognize the claim as of right, nor could the Court of Private Land Claims confirm it.

The fact that a parallelogram of 340 cordels by 222 cordels, making seven and one half sitios and two caballerias, if correctly measured from the initial point of Navamuel's survey, would be partly within the Territory of Arizona, is immaterial.

*Decree affirmed.*

Mr. Justice Peckham was not a member of the court at the time this case was argued, and took no part in its decision.