## UNITED STATES *v.* CAMOU.

### APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 35.  Submitted March 22, 1901.—Decided March 17, 1902.

From its examination of the evidence in this case this court concurs in the view of the Court of Private Land Claims that a definite location and possession of the grant here in question, prior to the date of the Gadsden treaty, are shown with reasonable certainty, and affirms the decree of that court confirming the claim to the extent of the four sitios granted and paid for.

In December, 1891, Juan Pedro Camou filed a petition in the Court of Private Land Claims, praying to have confirmed to him a certain tract of land situated in the county of Cochise, Territory of Arizona, known and designated as the San Rafael del Valle grant.   Subsequent proceedings resulted in a trial and a decree in favor of the Government, adjudging petitioner's claim and title invalid, and dismissing the petition.   The case was then brought by appeal to this court, where the decree of the Court of Private Land Claims was reversed and the case remanded for further proceedings.   171 U. S. 277.

Subsequently further proceedings were had in the Court of Private Land Claims in pursuance of the mandate of this court, resulting, on June 2, 1899, in a decree confirming the petitioner's title to 17,474.93 acres.   From this decree of confirmation an appeal was allowed to this court.

*Mr. Solicitor General, Mr. Matthew G. Reynolds* and *Mr. William H. Pope* for appellants.

*Mr. William Herring* and *Mr. Rochester Ford* for appellee.

MR. JUSTICE SHIRAS delivered the opinion of the court.

When this cause was before us, in 171 U. S. 277, the validity of the claim was, upon full consideration, upheld.   It was, however, held that the recovery should be restricted to the land

claimed in the petition and paid for, and as it was shown that the survey was in excess of the land granted and paid for, the cause was remanded to the Court of Private Land Claims for further proceedings which resulted, as shown by this record, in a final decree of confirmation, establishing the boundaries of the grant, and finding it to contain four sitios, or 17,474.93 acres.

The contention made on behalf of the Government, in this appeal, is that this grant of four sitios was a mere float within exterior boundaries containing a larger tract ; that there were no means afforded of identifying where, within those exterior boundaries, such four sitios were located ; that accordingly, as matter of law, prescribed in the sixth section of the Gadsden treaty, the tract cannot be said to have been located, and hence the grant must be held to be invalid.

It may well be doubted whether, even if this contention were well founded, it can be urged at this stage of the controversy.

When the case was originally tried in the Court of Private Land Claims, and subsequently was heard on appeal in this court, the principal contention on the part of the Government was that the State of Sonora had no power to make a grant of public lands, and hence that the grant in question, although made in the name and by the proper officers of that State, was invalid. The subject was fully considered by this court, and it was held that the several States of the Republic of Mexico, of which Sonora was one, had, at the time when the transaction in question took place, authority to make sales of vacant public lands within their limits.

The Government further contended that this and similar grants by the separate States had been annulled by certain decrees of Santa Anna, when acting as dictator of Mexico, and that, as the Government of the United States had recognized Santa Anna, in purchasing the territory covered by the Gadsden treaty, the courts of the United States must recognize, when dealing with personal rights existing in the ceded territory, his declarations or decrees in respect to titles, as authoritative. But this view of the legal effect of the decrees of Santa Anna

upon the private rights of residents within the ceded territory was not accepted by this court, and, for reasons given in the opinion of Mr. Justice Brewer, it was held that, as the grant made by the State of Sonora was valid when made, it was not destroyed by the arbitrary decree of a temporary dictator.

As, however, it appeared that the survey of the land claimed in the petition was in excess of the four sitios granted and paid for, the court applied the rule laid down in *Ely's Administrator* v. *United States*, 171 U. S. 220, that where there is a valid grant for a certain number of acres within the outboundaries of a larger tract, the Court of Private Land Claims may inquire, and, if it finds sufficient reasons for determining the true boundaries of the tract that was granted, it can so prescribe them, and sustain the claim to that extent.

Upon this second appeal we have only to consider whether the Court of Private Land Claims reached its final decree in due pursuance of the previous opinion and mandate of this court. The decision there made is the law of the case, and is not open for reconsideration in the subsequent appeal. This subject was recently considered in *Illinois* v. *Illinois Central Railroad*, 184 U. S. 77, and it was there shown that it is the settled law of this court that, after a case has been brought here and decided, and a mandate issued to the court below, if a second writ of error is sued out, it brings up for revision nothing but the proceedings subsequent to the mandate. None of the questions which were before the court on the first writ of error can be reheard or examined on the second. To allow a second writ of error or appeal to a court of last resort on the same questions which were open to dispute on the first would lead to endless litigation. In chancery a bill of review is sometimes allowed on petition to the court; but there would be no end to a suit if every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions, or speculate on chances for changes in its members.

Accordingly, in the present case, everything involved in the question of the validity of the grant might be deemed to have been determined on the first appeal, as well its alleged invalidity for want of definite location, as for the want of power in the

State of Sonora to make the grant. However, even if this view were waived, and it were conceded that our former mandate left it open to the Government to urge the invalidity of the grant by reason of alleged want of definite location, our examination of the record has satisfied us that the final decree of the Court of Private Land Claims defining the boundaries of the grant was justified by the evidence.

It is clearly shown that on March 12, 1827, Rafael Elias presented his petition to the treasurer general of the State of Sonora, asking for a grant of public lands adjacent to the ranch of San Pedro, within the jurisdiction of Santa Cruz; that on July 1, 1827, the treasurer general issued an order directed to the alcalde of the police of Santa Cruz, empowering him to proceed to survey, appraise and offer at public sale for thirty consecutive days the lands indicated in the petition; that on August 20, 1827, in obedience to said order, the alcalde executed what is called an act of obedience, wherein he stated that he would go to the ranch of San Pedro in order to proceed with the survey of the lands petitioned for; that he appointed four citizens to act as counters, tallymen and chainmen, who were duly qualified; that the survey was so proceeded in that there resulted a segregated tract of land containing four sitios, of which Rafael Elias took possession; that, at the conclusion of the survey, the testimonio states the alcalde proceeded to the appraisement of the land through experts, who adjudged the value of the four sitios to be $240, at the rate of $60 each; and that upon this appraisement the alcalde put them up at auction, asking for bidders, for thirty consecutive days, from August 30 to September 30, 1827. On September 30, 1827, after summoning the interested party, the alcalde remitted the proceedings to the treasurer general, who transmitted them to the fiscal attorney, who on February 7, 1828, reported his opinion that " the proceedings be continued to adjudication, according to the forms and requisites in use." The testimonio then states that the treasurer general, being satisfied with the report of the fiscal attorney, by order of April 16 proceeded, asking for bidders, and none appearing, the four sitios were auctioned off in favor of Rafael Elias. The testimonio further discloses that

the purchase money was duly paid into the treasury, and a certificate of the treasurer general, of April 21, 1828, concluded the proceedings; that, on December 25, 1832, followed the grant or patent by the treasurer general of the State of Sonora, stating that the proceedings had been concluded with all the requisites and formalites provided by law, and remained in the custody of the treasurer general as a perpetual monument of title; that therefore, in the exercise of the faculties conferred on him by law, and in the name of the sovereign State of Sonora, he granted in due form of law the four sitios of land for the raising of cattle and horses, comprised in the locality of San Rafael del Valle, situated in the jurisdiction of the presidio of Santa Cruz, in favor of the citizen Rafael Elias, to whom he conceded, gave and adjudged the said land by way of sale, with the condition and premanency established by the law, for himself and his successors, with the injunction and condition that he must keep said sitios occupied and settled, without letting them be abandoned or deserted at any time, with the understanding that if they be abandoned for the period of three consecutive years, and there should be any person to petition for them, in such event, with previous proof of the fact, they would be declared public lands and granted anew to the highest bidder, excepting in such cases where the abandonment was caused by the notorious invasion of the public enemies; and admonishing said Elias and his successors that they must keep and confine themselves to the land and limits as marked precisely in the foregoing proceedings of survey, and comply exactly with the law which imposed obligations to mark the metes and boundaries with monuments of stone and mortar. It is admitted by the Government that the expediente of this grant is on file in the archives of Hermosillo, and is in the usual form, and that on folio 11 and on the back of it, of the book of "Toma de Razon," is recorded an entry of the delivery of the title deed to Rafael Elias for four sitios of land, comprised in the place called Rafael del Valle, situate in the jurisdiction of the presidio of Santa Cruz. This was followed by evidence showing the continuous possession of the tract by Rafael Elias until forced to leave it by hostile incursions of the Apache Indians.

There was also proof of a regular deraignment of title from the original grantee to Camou, the appellee in the present case.

Taken together, the evidence adduced by the claimant on the first trial before the Court of Private Land Claims, and that introduced after our mandate had gone to that court, we think it is satisfactorily shown that the land described in the final decree is that described in the original survey and of which Rafael Elias was put in possession. The principal witnesses, in this part of the case, were George J. Roskruge, a surveyor of more than twenty years' experience in that part of the country, and who made the survey and map of the San Rafael del Valle land grant, which was used upon the trial. Douglass Snyder and Max Marks, who assisted in making that survey, were also examined. These witnesses were subjected to a rigorous cross-examination by the attorney of the Government, and their testimony has been minutely criticised in his brief.

But we are not able to perceive that the statements of these witnesses have been materially shaken. Some discrepancies indeed appear, but they are not important, and are naturally to be expected from the nature of the case. Neither the original nor the subsequent surveys were made with the care and precision that characterize surveys made in the long settled parts of the country. But it is evident, and this is the important point, that the latter surveys were made to verify and renew the original survey, and not with a purpose to locate a floating grant of uncertain boundaries and extent. In this particular this case is plainly distinguishable from the case of *Ainsa* v. *United States*, 161 U. S. 208, where the claimant's case failed because there had been no actual location of the grant prior to the Gadsden treaty, and because there was no satisfactory evidence that the act of juridical possession had ever taken place.

From our examination of the evidence we concur in the view of the Court of Private Land Claims, that a definite location and possession of the grant in question, prior to the date of the Gadsden treaty, are shown with reasonable certainty, and accordingly the decree of that court, confirming the claim to the extent of the four sitios granted and paid for, is

*Affirmed.*