## FEDERAL RESERVE BANK OF SAN FRANCISCO v. IDAHO GRIMM ALFALFA SEED GROWERS' ASS'N.

(Circuit Court of Appeals, Ninth Circuit. November 9, 1925. Rehearing Denied December 7, 1925.)

No. 4560.

1. **Appeal and error ⟨⟩1039(9)—Any error in failing to require plaintiff to elect as to causes of action on which it would proceed held not prejudicial.**

Court's refusal to require plaintiff to elect whether it would proceed on causes of action of equitable cognizance or causes of action cognizable at law *held* not prejudicial, where court granted nonsuit as to latter, thereby necessarily compelling plaintiff to proceed on the former.

2. **Appeal and error ⟨⟩1035—Court's refusal to transfer cause to equity side of court, after nonsuit granted as to causes of action cognizable at law, held not ground for complaint.**

Court's refusal to discharge jury and transfer cause to equity side of court for trial of causes of action of equitable cognizance, after nonsuit had been granted as to causes of action cognizable at law, *held* not ground for complaint, where court treated verdict of jury as advisory only, and in approving its findings asserted all the powers and assumed all the responsibilities of a chancellor.

3. **Equity ⟨⟩377—Submitting of issues to jury in advisory capacity is a matter of discretion with the court.**

In equity, practice of submitting issues to a jury in an advisory capacity is always per-

missible, and its adoption is a matter of discretion with the court.

**4. Appeal and error ☞949—Appellant cannot complain of matters of procedure resting in sound discretion of court.**

Appellant cannot complain of mere matters of procedure resting in sound discretion of the court.

**5. Evidence ☞177—Admission in evidence of compilation made by witness from books of bank showing its resources and liabilities when closed held not erroneous.**

In suit to recover for diversion of proceeds of drafts by discounting bank, with knowledge that forwarding bank was insolvent and that drafts were not its property, admission in evidence of compilation made by witness from books of forwarding bank, showing in detail resources and liabilities when closed, *held* not erroneous, where compilation was taken from books already in evidence, and its correctness was at no time questioned.

**6. Evidence ☞543(4)—State liquidating officer held qualified to express opinion as to value of equity in securities.**

State liquidating officer of insolvent bank, who had charge of its affairs from its close, who was permitted to state amount collected or realized from assets in his charge during preceding 10 months, and to state whether in his opinion any equity remained in pledged bills receivable of the bank after payment of loans secured by the pledges, *held* competent to express an opinion on the question, although his opinion was based on value of securities some time after close of bank.

**7. Witnesses ☞258—Testimony of witness, based on compilation prepared from books of bank, held admissible, where taken from books already in evidence, correctness of which was not disputed.**

In suit to recover for diversion of proceeds of drafts by discounting bank, with knowledge that forwarding bank was insolvent and that drafts were not its property, testimony of witness, based on compilation prepared from books of forwarding bank, showing number of overdue notes held by it and how long overdue, and deficiencies or excess of reserve on deposit with discounting bank on different dates, *held* admissible, where compilation was taken from books already in evidence, and its correctness was at no time questioned.

**8. Evidence ☞357—Letters held admissible as showing desperate condition of forwarding bank and knowledge of such condition by discounting bank.**

In suit to recover for diversion of proceeds of drafts by discounting bank, with knowledge that forwarding bank was insolvent and that drafts were not its property, letters passing between discounting bank and forwarding bank relative to application for loan by forwarding bank *held* admissible, as tending to show desperate condition of such bank at that time, and knowledge of that condition by discounting bank.

**9. Evidence ☞357—Letters showing condition of forwarding bank and knowledge thereof by discounting bank held admissible, though written some time before forwarding bank was closed.**

In suit to recover for diversion of proceeds of drafts by discounting bank, with knowledge that forwarding bank was insolvent and that drafts were not its property, letters passing between discounting bank and forwarding bank, relating to liquidation of loans of latter bank, *held* admissible as tending to show condition of such bank and knowledge of that condition by discounting bank, notwithstanding that they were written some time before bank was closed, where there was no substantial change in condition of bank from that date until time it closed, except perhaps for the worse.

**10. Banks and banking ☞73—When bank is considered "solvent," and when "insolvent," stated.**

Bank is "solvent" when it has enough assets to pay within a reasonable time all of its liabilities through its own agencies, and is "insolvent" when unable to meet its liabilities as they become due in ordinary course of business.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Insolvency—Insolvent; Solvency—Solvent.]

**11. Banks and banking ☞82(7)—Evidence held to justify that forwarding bank was insolvent when drafts were received.**

In suit to recover for diversion of proceeds of drafts by discounting bank, with knowledge that forwarding bank was insolvent and that drafts were not its property, evidence *held* to justify finding that forwarding bank was insolvent when drafts were received.

**12. Banks and banking ☞82(7)—Evidence held to justify finding of knowledge of insolvency of forwarding bank when drafts were received.**

In suit to recover for diversion of proceeds of drafts by discounting bank, with knowledge that forwarding bank was insolvent and that drafts were not its property, evidence *held* to justify a finding of knowledge of insolvency of forwarding bank by managing officers of both banks when drafts were received.

**13. Banks and banking ☞82(2)—Receipt of deposit by insolvent bank is fraud on depositor, and deposit may be followed so long as it can be identified.**

Receipt of a deposit by an insolvent bank is a fraud on depositor, and title to deposit does not pass, and may be followed so long as it can be identified.

**14. Banks and banking ☞82(2)—Insolvent bank, forwarding draft for discount, perpetrated fraud on owners, to which discounting bank was party.**

Where bank forwarding drafts to another bank for discount was insolvent at time of receipt of such drafts, and knowledge of such insolvency was possessed by officers of both banks, *held*, that a fraud was perpetrated on

owners of draft by forwarding bank, to which discounting bank became a party.

**15. Banks and banking ⬅82(2)—Bank discounting drafts held not bona fide purchaser before maturity, with unassailable title.**

Bank receiving drafts from forwarding bank for discount *held* not a bona fide purchaser before maturity, with an unassailable title, where it had notice that drafts were not property of forwarding bank.

In Error to the District Court of the United States for the Eastern Division of the District of Idaho; Frank S. Dietrich, Judge.

Action by the Idaho Grimm Alfalfa Seed Growers' Association against the Federal Reserve Bank of San Francisco and others. Judgment for plaintiffs, and the named defendant brings error. Affirmed.

Albert C. Agnew, of San Francisco, Cal., and Budge & Merrill, of Pocatello, Idaho, for plaintiff in error.

Whitcomb, Cowen & Clark, of Blackfoot, Idaho, and Jones, Pomeroy & Jones, of Pocatello, Idaho, for defendant in error.

Before GILBERT, HUNT, and RUDKIN, Circuit Judges.

RUDKIN, Circuit Judge. During the period herein mentioned, the Idaho Grimm Alfalfa Seed Growers' Association was a farm marketing association organized under the laws of that state, and was engaged in the business of cleaning and marketing alfalfa seed produced by its members. When alfalfa seed was sold, a draft was drawn on the buyer for the purchase price, with a bill of lading attached. Up to about a year prior to November 28, 1923, all drafts thus drawn were deposited with D. W. Standrod & Co., Bankers, for collection only, and the association was not permitted to draw against the amount of the drafts until payment was actually made to the Standrod Bank; but in the fall of 1922 this arrangement was changed through an agreement between the association and the Standrod Bank, and thereafter the association was given immediate credit for the amount of the drafts when deposited, and was permitted to draw against them to the full amount, if it so desired. If a draft was not paid when presented, the amount was charged back to the account of the association, and, if paid, the association was charged with interest on the amounts checked out before the draft was actually paid.

On November 23, 1923, the association drew a sight draft in the sum of $10,848.80 on Teweles & Co. for the purchase price of a carload of alfalfa seed shipped to that company. The draft was made payable to the Standrod Bank, had attached thereto a bill of lading for the shipment, and was accompanied by a letter of instructions, stating that payment might be deferred until the arrival of the car. The draft was then forwarded by the Standrod Bank to the Federal Reserve Bank at Salt Lake for discount, and was there discounted and the amount placed to the credit of the Standrod Bank. Two similar drafts were drawn by the association on November 26, 1923, for substantially similar amounts, and these drafts took the same course. It might be said in this connection, however, that the general manager of the association neglected to sign one of the last-mentioned drafts, and the defect was not discovered until the draft reached the Federal Reserve Bank at Salt Lake. The Standrod Bank was then notified of the defect over the telephone, and another draft was substituted in its place.

The Standrod Bank was open for the transaction of business for the last time on November 28, 1923, and on November 30, 1923, its affairs were taken over by the banking officers of the state. On the latter date the Standrod Bank had an overdraft with the Federal Reserve Bank in the sum of $47.96, and the association had a balance to its checking account, on the books of the Standrod Bank, in the sum of $32,295.20. On December 1, 1923, the association notified the banking officers of the state that the Standrod Bank was insolvent at the time of the receipt of the drafts, and that its officers and agents knew or had cause to believe that it was so insolvent, and the association made claim to the drafts, or, if collected, to the proceeds thereof. A copy of this notice was mailed to the Federal Reserve Bank on the same day.

The present action was then instituted by the association against the Federal Reserve Bank, the Standrod Bank, and the banking officers of the states to recover the amount of the three drafts or their value. The complaint contains six causes of action in all, or two causes of action based on each of the three drafts. The causes of action on each of the three drafts were identical in form, however, so that for present purposes reference need only be made to the first and second causes of action based on the draft of November 23, 1923. Speaking generally, it was alleged in the first cause of action that for upwards of a year prior to the date of the receipt of the draft in question the Standrod Bank was insolvent; that its directors

and managing officers, and the managing officers of the Federal Reserve Bank, were at all times fully aware of its insolvent condition; that the draft was forwarded to the Federal Reserve Bank for collection; that the amount thereof was collected by the Federal Reserve Bank after the close of the Standrod Bank, and that the Federal Reserve Bank refused to account for the proceeds thereof. In the second cause of action it was alleged that the draft was deposited with the Standrod Bank under an agreement between the association and the bank that the draft and the proceeds thereof should be and remain the property of the association, and that the title thereto, or to the proceeds thereof, should not become the property of the Standrod Bank.

At the commencement of the trial the Federal Reserve Bank moved the court to require the plaintiff to elect whether it would proceed on the first, third, and fifth causes of action, which it claimed were of equitable cognizance, or on the second, fourth, and sixth causes of action, which it claimed were cognizable at law. This motion was denied. The motion was renewed at the close of the testimony on the part of the plaintiff, but was again denied. A motion for a nonsuit was then granted as to the second, fourth, and sixth causes of action, but denied as to the remaining causes of action. The Federal Reserve Bank then moved the court to discharge the jury and transfer the cause to the equity side of the court. The court took this motion under advisement and directed the trial to proceed in the meantime. The cause was thereafter submitted to the jury under instructions to which no exceptions were taken, and the jury returned a verdict in favor of the plaintiff in the sum of $32,692.12.

Some time after the verdict was returned the court filed a memorandum on the motion to discharge the jury and transfer the cause to the equity side of the court, in which it said: "While the point is not entirely free from doubt, upon consideration I have concluded that the complaint was properly entertained upon the law side of the court. The further question of whether or not, if the verdict be taken as advisory only, it should be approved and adopted, I answer in the affirmative." The court then added: "Counsel for the plaintiff will prepare a judgment in the ordinary form of a judgment upon the verdict, incorporating therein, at the proper place, the additional clause, in substance, 'which finding of the jury is approved and adopted.'"

Judgment was thereafter entered upon the verdict, as directed by the court, after making certain deductions for moneys checked out by the plaintiff before the close of the Standrod Bank. The judgment thus entered has been brought here for review by writ of error.

[1] The first assignment of error is based on the refusal of the court to require the defendant in error to elect whether it would proceed on the even or odd numbered causes of action. In answer to this assignment we need only say that the granting of the nonsuit as to the even-numbered causes of action necessarily compelled the defendant in error to proceed on the remaining causes of action, and conceding, for the purposes of this case only, that it was error not to require an election at an earlier stage of the trial, the error was plainly and manifestly without prejudice.

[2-4] The next assignment of error is based on the refusal of the court to discharge the jury and transfer the cause to the equity side of the court after the nonsuit had been granted as to the even-numbered causes of action. Again, if we concede that the action or actions were of equitable cognizance, no error can be predicated upon the action of the court in submitting the issues to a jury in an advisory capacity, because that practice is always permissible and its adoption is a matter of discretion with the court; and when the court treated the verdict as advisory only, and approved the findings of the jury, it asserted all the powers and assumed all the responsibilities of a chancellor. This was the utmost consideration to which the plaintiff in error was entitled, and it is in no position to complain of mere matters of procedure resting in the sound discretion of the court. We might say in this connection, however, that it does not appear to us that the defendant in error was seeking to enforce a trust or to follow trust funds. It proceeded upon the theory that the diversion of the proceeds of the drafts by the Federal Reserve Bank, with knowledge that the Standrod Bank was insolvent, and with knowledge that the drafts were not the property of the Standrod Bank, was a tort or wrong for which a court of law has always afforded a full, complete, and adequate remedy.

[5] Numerous errors have been assigned on the admission of testimony over objection. The defendant in error offered in evidence a compilation made by one of the witnesses from the books of the bank, showing in detail the resources and liabilities of the bank at

the close of business on November 28, 1923. This compilation or summary was taken from books already in evidence; its correctness was at no time questioned, and is not questioned now. There was no error in this ruling. San Pedro Lumber Co. v. Reynolds, 121 Cal. 74, 53 P. 410; Jordan v. Warner's Estate, 107 Wis. 539, 83 N. W. 946; State v. Brady, 100 Iowa, 191, 69 N. W. 290, 36 L. R. A. 693, 62 Am. St. Rep. 560.

[6] The liquidating officer of the state, who had charge of the affairs of the Standrod Bank since its close, was permitted to give the amount collected or realized from the assets in his charge during the preceding 10 months, and to state whether, in his opinion, any equity remained in the pledged bills receivable of the bank after payment of the loans secured by the pledges. As already stated, the witness had been in charge of the affairs of the bank for about 10 months; it was his duty to collect and distribute the assets in his charge, and he had devoted his entire time and attention to that object. He had consulted with the collecting agent of the Federal Reserve Bank, and was more familiar with the assets of the bank and their probable value than any other person, except perhaps the managing officers of the bank. He was competent, therefore, to express an opinion on the question submitted, and the fact that his opinion was based on the value of the securities some time after the close of the bank would go to the weight of his testimony, not to its competency. State v. Cadwell, 79 Iowa, 432, 44 N. W. 700; Campbell v. Park, 128 Iowa, 181, 101 N. W. 861, 104 N. W. 799.

[7] The plaintiff in error moved to strike the testimony of one of the witnesses, based on a compilation prepared from the books of the Standrod Bank in evidence, showing the number of overdue notes held by the Standrod Bank, and how long overdue, and the deficiency or excess of reserve on deposit with the Federal Reserve Bank on different dates. There was no error in this ruling, for reasons already stated.

[8] Under date of November 10, 1923, or 18 days before the close of the bank, the vice president and manager of the Standrod Bank addressed a letter to the managing officer of the Federal Reserve Bank, stating that he had found it necessary to take advantage of the offer of the latter to handle a note of $10,000; that he was inclosing the note therewith, payable 10 days from November 13, adding: "This will tide us over." The manager of the Federal Reserve Bank answered this letter under date of November 14, 1923, stating that the discount committee of the Federal Reserve Bank had declined to accept the note for discount, and further that the directors of the Federal Reserve Bank were of opinion that the Federal Reserve branch had advanced a sufficient sum to provide for the ordinary needs of the Standrod Bank, and that, considering all the features entering into the security pledged as collateral to its obligation now owing to the Federal Reserve Bank, it was only proper that the directors and stockholders of the Standrod Bank should provide funds out of their personal resources of a sufficient amount to properly rehabilitate the Bank and furnish it with a large enough amount of working capital to have the bank function in a proper manner. Error is assigned in the admission of these two letters, but the assignment is without merit. The letters clearly tended to show the desperate condition of the Standrod Bank on that date and knowledge of that condition on the part of the Federal Reserve Bank.

[9] Under date of September 9, 1922, the assistant manager of the Federal Reserve Bank addressed a letter to the president of the Standrod Bank, stating that the harvest season was on; that he desired to impress upon the officers of the bank the necessity of shaping their affairs so that, after the period of liquidation was over, the bank would show a decided improvement in its condition; that at that time the loans of the institution approximated $1,700,000, while the deposits were less than one-half that amount, or in the neighborhood of $785,000; that these figures spoke for themselves and called for no comment; that, if the Standrod Bank expected to continue to receive assistance from the Federal Reserve Bank, a determined effort must be put forth by its officers to the end that a proper ratio between loans and deposits might be shown; and the president of the Standrod Bank was directed to bring the letter to the attention of the board of directors and furnish the Federal Reserve Bank with a letter, over the signature of each, outlining what the Federal Reserve Bank might expect in that regard.

This letter was answered by the president of the Standrod Bank under date of September 11, 1922. In this letter he stated that they expected to reduce their loans to $1,200,000 that season; that with this reduction there would no doubt be a corresponding increase in deposits; that the officers of the Standrod Bank realized that it would take another year to put everything in shape, where there would be no borrowed money;

that in a great many cases they had loaned money to farmers and stockmen, and it was absolutely necessary to make further advances in order to secure liquidation on their present indebtedness.

This letter was answered under date of September 12, by the assistant manager of the Federal Reserve Bank, by a second letter, stating that the letter of the president of the Standrod Bank was unsatisfactory for two reasons: First, because a communication over the signature of each of the directors, setting forth what might thenceforth be expected from the bank, was not furnished as requested; and, second, while the Federal Reserve Bank was not in a position to know how great a reduction in loans should be made, it believed that the policy of the Standrod Bank should be to bring about the greatest possible liquidation, to the end that it might again resume a position more nearly bordering on the sound and normal.

These letters were objected to for the like reasons as the letters already considered, but, in our opinion, they were competent for the same reasons. They tended to show the condition of the Standrod Bank, and knowledge of that condition on the part of the Federal Reserve Bank. True, the letters were written a little more than a year before the bank closed, but other testimony in the case shows that there was no substantial change in the condition of the bank from that date until the time it closed, except perhaps for the worse, as the disparity between loans and deposits was even greater when the bank closed than when these letters were written.

[10] It only remains to consider the question of the insolvency of the Standrod Bank, knowledge of that insolvency on the part of its officers and the officers of the Federal Reserve Bank, and the effect of such insolvency and knowledge, if proven. A bank is said to be solvent when it has enough assets to pay, within a reasonable time, all of its liabilities through its own agencies, and is insolvent when unable to meet its liabilities as they become due in the ordinary course of business, or, in shorter terms, when it cannot pay its deposits on demand in accordance with its promise. 7 C. J. 727. Measured by this rule, we think the court and jury were amply justified in finding that the bank was insolvent, if indeed it was not wholly and hopelessly so.

When the bank closed, its deposits were approximately $500,000 and its loans and discounts approximately $1,300,000. It had borrowed from the plaintiff in error the sum of approximately $700,000, from the United States National Bank of Portland approximately $85,000, and from the National Bank at Pocatello, Idaho, $20,000. It had pledged with the plaintiff in error, as security for its loan, bills receivable of the face value of approximately $900,000, with the United States National Bank of Portland bills receivable of the face value of approximately $175,000, and with the bank at Pocatello bills receivable of the face value of approximately $30,000; and we think it fairly appears from the testimony that there was no equity in the bills receivable thus pledged, after the payment of the loans which they were pledged to secure. There was left with the bank, to meet its ordinary demands from day to day and to pay its depositors, bills receivable of the face value of approximately $275,000 and a small amount in stocks, bonds, warrants, and overdrafts. During the 10 months which had elapsed since the bank closed its doors, the liquidating officer of the state had been able to realize but $40,000 or $50,000 from the assets and resources that came into his hands. In the summer of 1923, the board of directors considered the proposition of forming a holding company to take over $300,000, $400,000 or $500,000 in face value of the uncollectible paper of the bank, but the vice president and manager did not think that this would suffice.

[11] During July and August, 1923, the Pacific Joint-Stock Land Bank forwarded two checks to the Standrod Bank, aggregating the sum of $11,000, with instructions to obtain releases of liens against property and turn the proceeds over to borrowers from the Joint-Stock Land Bank. The releases were not returned, and several letters passed without satisfaction. A representative of the Joint-Stock Land Bank was then sent to the Standrod Bank to inquire into the matter. He there discovered that the money had been misapplied, and was informed by the vice president and manager that the demands upon the bank were rather large and unusual, and that, owing to low reserves, he was not in a position to repay the money. He asked for further time, but this was refused. Several meetings of the board of directors followed, and finally, about two days later, the representative of the Land Bank received a draft on the Walker Bros.' Bank at Salt Lake City for the amount. We have already referred to the refusal of the loan of $10,000 a few days before the close of the bank to tide it over.

As against this the only testimony offered by the plaintiff in error was some testimony

tending to show that the officers of the Standrod Bank had no knowledge of its insolvent condition. While the testimony had that tendency, if credited by the court and jury, it likewise had a strong tendency to show that the bank was in fact insolvent. It appeared from the testimony of one of the directors that nearly all the loans had been outstanding since the close of the war; that there was no money in the country; that the bank was unable to make collections; that its deposits had decreased from $1,500,000 to about $500,000; that the directors of the bank had pledged their personal credit to raise money for the bank; in short, that the condition of the bank was all but desperate. Under these circumstances, it is idle to claim that the finding of the court and jury on the question of insolvency was not justified by the testimony.

[12-14] The claim that the directors and managing officers of the Standrod Bank had no notice or knowledge of the existing condition is equally unfounded. The directors, called as witnesses, derived their knowledge of the condition of the bank, in most part, from reports made to them by other officers of the bank, and it is a significant fact that such other officers were not called as witnesses. True, they might have been called by the defendant in error; but officers who receive deposits in an insolvent bank are guilty of a fraud, if not a crime, and a third party who undertakes to prove the fact of insolvency cannot be expected to call the perpetrators of the fraud as witnesses. Furthermore, the insolvent condition of the bank had so long continued, and was manifested in so many different ways, that a finding of knowledge of insolvency on the part of the managing officers of both banks was fully justified. If this be true, all the authorities agree that the receipt of a deposit by an insolvent bank is a fraud on the depositor, that title to the deposit does not pass, and that the deposit may be followed so long as it can be identified. A fraud was thus perpetrated on the defendant in error by the officers of the Standrod Bank, and, wittingly or unwittingly, the Federal Reserve Bank became a party to the fraud.

[15] It is lastly contended that the plaintiff in error is a bona fide purchaser before maturity and that its title cannot be thus assailed. But the Federal Reserve Bank had notice that the drafts were not the property of the Standrod Bank, in two ways: First, because it was apparent that the Standrod Bank had no funds with which to purchase the drafts; and, second, because the applications for discount stated on their face that the drafts were the property of a depositor. With this knowledge, a finding of mala fides on the part of the plaintiff in error was justified, and the plea of bona fide purchaser cannot prevail.

The judgment is affirmed.