FEDERAL RESERVE BANK OF KANSAS CITY, MO., v. OMAHA NAT BANK OF OMAHA, NEB., et al.

WYOMING NAT. BANK OF CASPER, WYO., v. FEDERAL RESERVE BANK OF KANSAS CITY, MO., et al.

OMAHA NAT. BANK OF OMAHA, NEB., v. SAME.

Nos. 8745–8747.

Circuit Court of Appeals, Eighth Circuit.

Nov. 14, 1930.

Arthur R. Wells, of Omaha, Neb. (Halleck F. Rose, Paul L. Martin, and Winthrop B. Lane, all of Omaha, Neb., on the brief), for Omaha Nat. Bank of Omaha, Neb.

Edgar M. Morsman, Jr., of Omaha, Neb., for Wyoming Nat. Bank of Casper.

H. G. Leedy, of Kansas City, Mo. (Harry O. Palmer and Arthur L. Palmer, both of Omaha, Neb., on the brief), for Federal Reserve Bank of Kansas City, Mo.

Before KENYON, BOOTH, and GARDNER, Circuit Judges.

BOOTH, Circuit Judge.

These three appeals grow out of one case, and have been heard upon the same record.

The suit was originally brought by the Omaha National Bank of Omaha against the Federal Reserve Bank of Kansas City, Mo., Wyoming National Bank of Casper, Wyo., First National Bank of Cheyenne, Wyo., and T. E. McClintock, receiver of the First National Bank of Cheyenne, Wyo.

For brevity, the parties will be referred to respectively as the Omaha bank, the Federal Reserve Bank, the Casper bank, and the Cheyenne bank.

The suit was brought by the Omaha bank to set aside a certain transfer of a fund or credit standing in the name of the Casper bank on the books of the Federal Reserve Bank, Omaha branch, and to establish and enforce in the Omaha bank an equitable title to said fund or credit.

The decree below adjudged that the Casper bank was holding the apparent title to said fund or credit (amounting to $60,000) as trustee for the Omaha bank to the extent of $50,000.

From that decree, the Casper bank has appealed, first, on jurisdictional grounds; second, as to the merits.

The Federal Reserve Bank has appealed on jurisdictional grounds alone.

The Omaha bank has taken a cross-appeal, contending that the decree should have adjudged that the Casper bank held apparent title to the whole $60,000 in trust for the Omaha bank.

#### Prior History of the Case.

The case has been before this court on a former appeal. 26 F.(2d) 884. Questions of jurisdiction alone were involved. The facts alleged in the complaint were fully set out in the opinion rendered at that time, and need not be here repeated. A brief summary at this time of the jurisdictional grounds alleged will suffice.

There are allegations in the bill which may fairly be taken as a basis for jurisdiction in the United States court on the following grounds:

(1) The existence of a federal question arising out of the construction of section 5242, R. S., under which a cause of action is claimed.

(2) That the suit is against an officer of the United States, namely, the receiver of the Cheyenne National Bank, who is made a party defendant in the suit.

(3) Diversity of citizenship—existing as to all of the defendants except the Federal Reserve Bank, and that bank being a federal corporation.

(4) Diversity of citizenship—existing as to all of the defendants except the Reserve Bank, and that bank having no citizenship and being a merely nominal party.

After the commencement of the suit, the third ground of jurisdiction became of no avail, as this court had meanwhile decided, by reason of a recent statute, that incorporation under a federal statute could no longer constitute a basis for jurisdiction in the federal court. Act of February 13, 1925 (43 Stat. 941, 28 USCA § 42); Federal Land Bank v. United States (C. C. A.) 13 F. (2d) 36.

The final holding of the trial court, prior to the first appeal, was that jurisdiction of the suit did not exist in the federal court. The first ground was discussed at length, and a holding was made adverse to the plaintiff. The third ground had been abandoned. The second and fourth grounds were not discussed by the trial court. A decree was entered dismissing the bill, and appeal to this court followed.

The holding of this court on that appeal was that jurisdiction existed on the fourth ground; namely, diverse citizenship of all of the defendants except the Federal Reserve Bank—and that bank having no citizenship and being a merely nominal party.

When the case came on before the trial court a second time, that court again rejected the first ground of jurisdiction above mentioned, but followed the ruling of this court that jurisdiction existed on the fourth ground. The second ground was not discussed.

Both parties have again raised the jurisdictional questions in this court. The present contention of the plaintiff is that jurisdiction exists on three of the grounds above men-

tioned, namely, the first, second, and fourth, and we are urged so to hold. The Federal Reserve Bank and the Casper bank, on the other hand, contend that jurisdiction does not exist on any of the grounds mentioned, and ask that the decree be reversed, with instructions to dismiss the bill.

■ As to the ground of jurisdiction found by this court on former appeal to exist, we content ourselves with saying that we adhere to that decision on the ground that it is the "law of the case," and not within any exception to that rule. Richardson v. Ainsa, 218 U. S. 289, 295, 31 S. Ct. 23, 54 L. Ed. 1044; City and County of Denver v. Denver Tramway Corp. (C. C. A. 8) 23 F.(2d) 287, 293; Granite Brick Co. v. Titus (C. C. A.) 226 F. 557; Lackner v. McKechney (C. C. A.) 2 F.(2d) 516; Thompson v. Maxwell, etc. Co., 168 U. S. 451, 18 S. Ct. 121, 42 L. Ed. 539; United States v. Camou, 184 U. S. 572, 22 S. Ct. 505, 46 L. Ed. 694; City of Seattle v. Puget Sound, etc., Co. (C. C. A.) 15 F.(2d) 794; Texas Co. v. Pensacola, etc., Corp. (C. C. A.) 292 F. 61; 4 C. J. § 3075. Slaker v. O'Connor, 278 U. S. 188, 49 S. Ct. 158, 73 L. Ed. 258, is not to the contrary.

In Thompson v. Maxwell, etc., Co., the court said (page 456 of 168 U. S., 18 S. Ct. 121, 123):

"It is settled law of this court, as of others, that whatever has been decided on one appeal or writ of error cannot be re-examined on a second appeal or writ of error brought in the same suit. The first decision has become the settled law of the case."

In the City and County of Denver v. Denver Tramway Corp. Case, this court said [page 293 of 23 F.(2d)]:

"On the present appeal the assignments of error raising jurisdictional questions are very similar to those on the former appeal, and are based upon the same motion to dismiss.

"It thus appears that this same motion to dismiss containing alleged jurisdictional grounds is now before this court which was before it on the former appeal, and that the assignments of error touching the jurisdictional questions are substantially the same on the two appeals. It follows that, in so far as the jurisdictional questions now presented were presented and decided upon the former appeal, they are no longer open to review. That decision has become the law of the case."

In the City of Seattle v. Puget Sound, etc., Co. Case, the court said [page 795 of 15 F.(2d)]:

"The rule is firmly established that the decision of an appellate court on appeal or writ of error is controlling upon the court below after the case has been remanded, and is equally controlling upon the appellate court on a second appeal or writ of error in the same case. No doubt isolated cases may be found where appellate courts have disregarded the rule, and their power to do so is not questioned; but the overwhelming weight of authority is in its favor, unless between the two decisions there has been some change in the law, by legislative enactment or judicial decision, which the appellate court is bound to follow. The rule itself has been iterated and reiterated by the Supreme Court and by this court."

In the Texas Co. v. Pensacola, etc., Corp. Case, the court said (page 64 of 292 F.):

"While this court may have the power, under special circumstances, to re-examine questions decided on a previous hearing of the same case, * * * as a general rule the decision on a first appeal, or writ of error, is thereafter the law of the case."

■ If, however, the question were still open, yet the decision on the former appeal is, in our judgment, in accord with the highest authorities on the point involved. A custodian or stakeholder of property is usually held to be a merely nominal party whose citizenship does not affect the question of federal jurisdiction. Salem Trust Co. v. Manufacturers' Co., 264 U. S. 182, 189, 190, 44 S. Ct. 266, 68 L. Ed. 628, 31 A. L. R. 867; Bacon v. Rives, 106 U. S. 99, 104, 1 S. Ct. 3, 27 L. Ed. 69; Walden v. Skinner, 101 U. S. 577, 588, 25 L. Ed. 963; Fienup v. Kleinman, 5 F.(2d) 137 (C. C. A. 8); White v. Chase, 201 F. 896 (C. C. A. 8). See, also, Rogers v. Penobscot Mining Co., 154 F. 606 (C. C. A. 8).

The first ground of jurisdiction above mentioned, viz. under section 5242, Rev. St. (12 USCA § 91), was not definitely passed upon on the former appeal. We therefore feel at liberty to discuss it, and are impelled to do so on account of the earnest and vigorous arguments of the opposing parties.

Section 5242, Rev. St. (12 USCA § 91), will be found in the margin.[1]

---

[1] "All transfers of the notes, bonds, bills of exchange, or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion, or other valuable thing for its use, or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a

■ One of the general purposes of this section was to secure, in the event of insolvency, a ratable distribution of the assets of the insolvent bank in accordance with law. First National Bank v. Colby, 21 Wall. 609, 22 L. Ed. 687; Bailey v. Mosher, 63 F. 488, 491 (C. C. A. 8); Hayden v. Thompson, 71 F. 60, 65 (C. C. A. 8); Stuart v. Hayden, 72 F. 402, 405 (C. C. A. 8); Steele v. Randall, 19 F.(2d) 40 (C. C. A. 8).

■ A transfer made "in contemplation of insolvency" means one that is actuated by the knowledge of insolvency. Roberts v. Hill (C. C.) 24 F. 571, 573; In re Dibblee, 7 Fed. Cas. 651, 654, No. 3884; Hayden v. Chemical National Bank (C. C. A.) 84 F. 874; Ball v. German Bank, 187 F. 750, 753 (C. C. A. 8); Browne v. Stronach (D. C.) 7 F.(2d) 685, 688.

■ The intent to give a preference is presumed when a payment is made to a creditor by a bank whose officers know of its insolvency, and therefore that it cannot pay all of its creditors in full. National Sec. Bank v. Butler, 129 U. S. 223, 231, 9 S. Ct. 281, 32 L. Ed. 682; Roberts v. Hill (C. C.) 24 F. 571, 574; Ball v. German Bank, supra; Browne v. Stronach, supra; Brill v. McInnes, 14 F. (2d) 306 (C. C. A. 8); Parks v. Knapp, 29 F.(2d) 547 (C. C. A. 8).

The Omaha bank contends that the transaction complained of in its bill comes within the purview of the statute, and is therefore null and void. The Omaha bank further contends that it is the only creditor of the Cheyenne bank which has suffered loss by the transaction, and therefore that it may seek recovery for itself alone in reliance upon the statute.

■ The question therefore arises: May the Omaha bank, which claims to have suffered the loss, bring suit to have the transfer adjudged null and void by virtue of the statute. The answer to this question depends upon the construction to be placed upon the statute. This raises a federal question, and gives the United States court jurisdiction of the suit. Foster, Fed. Prac. (6th Ed.) § 24; Smith v. Kansas City T. & T. Co., 255 U. S. 180, 199, 41 S. Ct. 243, 65 L. Ed. 577; Greene v. L. & I. R. Co., 244 U. S. 499, 508, 37 S. Ct. 673, 61 L. Ed. 1280, Ann. Cas. 1917E, 88; Siler v. L. & N. R. Co., 213 U. S. 175, 191, 29 S. Ct. 451, 53 L. Ed. 753; Illinois Cent. R. Co. v. Chicago, 176 U. S. 646, 656, 20 S. Ct. 509, 44 L. Ed. 622; Ames v. Kansas, 111 U. S. 449, 469, et seq., 4 S. Ct. 437, 28 L. Ed. 482; Scott v. First National Bank, 285 F. 832 (C. C. A. 8); Nashville, C. & St. L. Ry. Co. v. Taylor (C. C.) 86 F. 168.

■ The existence of this federal question was a ground for jurisdiction in the court as a federal court, and this jurisdiction continued to exist even though the construction placed upon the statute by the court was finally unfavorable to the plaintiff, or even though it was finally decided that plaintiff failed to prove a cause of action under the section of the statute, although the construction of the statute was favorable to him. Foster, Fed. Prac. (6th Ed.) § 24, pp. 82, 83; Siler v. L. & N. R. Co., supra, and cases cited; Greene v. L. & I. R. Co., supra; Ohio Tax Cases, 232 U. S. 576, 586, 34 S. Ct. 372, 58 L. Ed. 737; Mich. Cent. R. Co. v. Vreeland, 227 U. S. 59, 63, 33 S. Ct. 192, 57 L. Ed. 417, Ann. Cas. 1914C, 176; Conn v. Ringer (C. C. A.) 32 F.(2d) 639, 642; Mich. Railroad Tax Cases (C. C.) 138 F. 223, 230, 231.

Our conclusion is, upon this branch of the case, that the court had jurisdiction both on the first and fourth grounds above stated. We pretermit as unnecessary any discussion of the second ground. The third ground, as already stated, has been abandoned.

### The Question of Venue and Section 57, Judicial Code.

■ Allied to the question of jurisdiction of the court as a federal court is the question of venue in the sense of territorial limitation of jurisdiction. The bill clearly shows that the suit was brought in the District of Nebraska in reliance upon section 57, Judicial Code (28 USCA § 118). That section will be found in the margin.[2]

[2] Judicial Code, § 57 (28 USCA § 118).

"When in any suit commenced in any district court of the United States to enforce any legal or equitable lien upon or claim to, or to remove any incumbrance or lien or cloud upon the title to real or personal property within the district where such suit is brought, one or more of the defendants therein shall not be an inhabitant of or found within the said district, or shall not voluntarily appear thereto, it shall be lawful for the court to make an order directing such absent defendant or defendants to appear, plead, answer, or demur by a day certain to be designated, which order shall be served on such absent defendant or defendants, if practicable, wherever found, and also upon the person or persons in possession or charge of said property, if any there be; or where such personal service upon such absent defendant or defendants is not practicable, such order shall be published in such manner as the court may direct, not less than once a week for six consecutive weeks. In case such absent de-

view to the preference of one creditor to another, except in payment of its circulating notes, shall be utterly null and void; and no attachment, injunction or execution, shall be issued against such association or its property before final judgment in any suit, action or proceeding, in any State, county, or municipal court. (R. S. § 5242.)"

516

The main question arising under this section in the case at bar is whether there existed in the District of Nebraska real or personal property to which the Omaha bank claimed an equitable title; in other words, a res which could be adjudged upon and disposed of by the federal court. This question was fully argued and presented upon the former appeal, and was decided by this court as set forth in the exhaustive analysis and discussion contained in the opinion written by Judge Lewis. As heretofore stated, that decision has become the "law of the case."

### The Case on the Merits.

Turning to the merits, there was evidence tending to show the following facts: Business relations existed between the Omaha bank and the Cheyenne bank; also between the Casper bank and the Cheyenne bank. Other relations also existed between the two latter banks; Mr. Brooks, president of the Casper bank, was a stockholder in the Cheyenne bank; Mr. Richardson, a director in the Casper bank, was also a stockholder in the Cheyenne bank; Mr. Abbott, president of the Cheyenne bank, was a director in the Casper bank.

From June 6 to June 24, 1924, Mr. Lorang, a national bank examiner, was at Cheyenne making an examination of the Cheyenne bank. He found the bank carrying $650,000 to $700,000 of doubtful or worthless paper, and he told the directors of the bank that this paper must be eliminated. The capital and surplus of the bank amounted to only $400,000. At the suggestion of the directors of the Cheyenne bank, the examiner left

fendant shall not appear, plead, answer, or demur within the time so limited, or within some further time, to be allowed by the court, in its discretion, and upon proof of the service or publication of said order and of the performance of the directions contained in the same, it shall be lawful for the court to entertain jurisdiction, and proceed to the hearing and adjudication of such suit in the same manner as if such absent defendant had been served with process within the said district; but said adjudication shall, as regards said absent defendant or defendants without appearance, affect only the property which shall have been the subject of the suit and under the jurisdiction of the court therein within such district, and when a part of the said real or personal property against which such proceedings shall be taken shall be within another district, but within the same State, such suit may be brought in either district in said State. Any defendant or defendants not actually personally notified as above provided may, at any time within one year after final judgment in any suit mentioned in this section, enter his appearance in said suit in said district court, and thereupon the said court shall make an order setting aside the judgment therein and permitting said defendant or defendants to plead therein on payment by him or them of such costs as the court shall deem just; and thereupon said suit shall be proceeded with to final judgment according to law."

Cheyenne and went to Denver, ready to return when and if necessary. Mr. Brooks discussed the affairs of the Cheyenne bank with Mr. Abbott. Mr. Johnston, a director and cashier of the Cheyenne bank, discussed the affairs of the bank with Mr. Brooks and Mr. Richardson. A conference was held at Denver the latter part of June or the first part of July, at which the affairs of the Cheyenne bank were discussed. Officers of the Cheyenne bank and Mr. Lorang, the United States examiner, and Mr. Richardson were among those present. As a last resort, negotiations were entered into looking to a merger of the Cheyenne bank with the American National Bank of Cheyenne. A conference was held at Cheyenne commencing July 5th or 6th and lasting until late at night July 8th, or early in the morning of July 9th, at which conference were discussed the affairs of the Cheyenne bank and the proposed merger with the American National Bank. Officers of the Cheyenne bank, and Mr. Lorang, Mr. Brooks, and Mr. Richardson, and others were present at this conference. It developed that bad paper to the amount of $1,400,000 was held by the Cheyenne bank. The proposed merger fell through. On the morning of July 9th, the directors of the Cheyenne bank met and passed a resolution that the bank be closed and turned over to Mr. Lorang. He accordingly took charge at once and remained in charge until the appointment of the receiver. Meanwhile, the balance standing to the credit of the Casper bank on the books of the Cheyenne bank had been rapidly reduced. On June 28th the balance was $360,224. By July 8th it had been reduced to $12,041. This reduction was stated by Mr. Shumaker, vice president and cashier of the Casper bank, to have been made by him because a note which matured June 26th, and which had been sent for collection or renewal to the Cheyenne bank, was not paid or renewed, and report made, on June 26th, 27th, or 28th; and this fact made him apprehensive of the condition of the Cheyenne bank, and accordingly he began to reduce the balance of his bank with the Cheyenne bank. After June 28th, the relations of the Casper bank with the Cheyenne bank changed, in that the Casper bank sent smaller remittances and drew more drafts. It goes without saying that this drastic reduction and this change of relations were made with the knowledge of the Cheyenne bank. On July 7th, the Casper bank sent a telegram to the Cheyenne bank, reading as follows:

"Transfer by telegraph to our credit in Omaha branch Federal Reserve Bank and charge our account Sixty Thousand Dollars."

Thereupon, on the same day, the Cheyenne bank sent a telegram to the Omaha bank, reading as follows:

"Charge our account at current rate of exchange Sixty Thousand Dollars. Deposit with Federal Reserve Bank Omaha branch for credit of Wyoming National Bank of Casper, Wyoming."

The Omaha bank received this telegram after banking hours on the 7th, and on the morning of the 8th it carried out the instructions of the telegram, and had $60,000 placed to the credit of the Casper bank on the books of the Federal Reserve Bank, and had its own account charged with the same amount on those books.

On July 5th the Cheyenne bank had mailed to the Omaha bank a draft on Boston for $50,000, and this draft was received by the Omaha bank on July 7th. The amount was placed to the credit of the Cheyenne bank, and the draft forwarded for collection. This was in accordance with the custom of the two banks. On the 7th of July, the Cheyenne bank sent to the Omaha bank another similar draft for $50,000, and this was received by the Omaha bank on the 8th and handled in the same manner as the first draft. The usual time for items sent from Omaha to reach Boston was two or three days. Before either of these two drafts reached the Boston bank, that bank had received notice from the bank examiner in charge of the Cheyenne bank not to honor the drafts. The drafts were accordingly dishonored and returned to the Omaha bank. After charging back the two $50,000 drafts, the account of the Cheyenne bank with the Omaha bank was overdrawn $84,338.

From the foregoing facts and others of similar character we think it is clearly to be inferred that the Cheyenne bank knew, at least as early as the time when it sent the telegram to the Omaha bank, that it was insolvent, that it would shortly close, and that the first $50,000 draft would not be paid before the bank closed.

It is further clearly to be inferred that the transfer of credit to the Casper bank which the telegram to the Omaha bank directed was made by the Cheyenne bank in contemplation of the act of insolvency which followed, viz. the closing of the bank; and that it was made in order to prefer the Casper bank as a creditor.

It is further clearly to be inferred that the Casper bank knew that it was receiving the $60,000 credit from the Cheyenne bank at a time when the latter was insolvent, and that the credit was transferred at the expense of some one or all of the creditors of the Cheyenne bank.

This transfer of credit to the Casper bank is described by counsel for the Casper bank as follows:

"The Federal Reserve Bank was indebted to the Omaha National Bank. At the request of the First National Bank of Cheyenne, the Omaha National Bank causes a part of its credit ($60,000.00) with the Federal Reserve Bank to be transferred to the Wyoming National Bank of Casper, and as a result of the transaction, the Federal Reserve Bank is indebted to the Wyoming National Bank of Casper for $60,000.00 instead of being indebted to the Omaha National Bank for that sum, and the Omaha National Bank is owed $60,000.00 by the First National Bank of Cheyenne instead of that bank being indebted to the Wyoming National Bank of Casper for the like amount."

This analysis is correct, as far as it goes, but it does not go to the bottom of the transaction. In the final analysis, the transaction was this: First, an advancement of credit of $60,000 by the Omaha bank to the Cheyenne bank; second, a transfer of this credit by the Cheyenne bank to the Casper bank by the placing of this credit on the books of the Federal Reserve Bank in the name of the Casper bank.

All this was accomplished by the short-cut method of having the Omaha bank direct the Federal Reserve Bank to place $60,000 to the credit of the Casper bank and charge the same to the account of the Omaha bank.

If we are correct in our analysis, then there was a transfer by the Cheyenne bank to the Casper bank of $60,000 or credit to that amount, which had been derived from the Omaha bank.

It is contended that there was no advancement of credit by the Omaha bank to the Cheyenne bank, but that the Cheyenne bank already had a credit in the Omaha bank.

The evidence shows that on July 7th, when the telegram was received by the Omaha bank, the Cheyenne bank had a very small amount to its credit in the Omaha bank apart from the *conditional* credit created by the $50,000 draft on Boston; and, even counting this, the credit did not amount to $60,000.

We have then a transfer of a credit or fund by the Cheyenne bank to the Casper bank made in contemplation of an act of insolvency, and "with a view to the preference of one creditor to another." Section 5242,

Rev. St. (12 USCA § 91) denounces such transfer as null and void; but the question remains whether such result can be adjudged at the suit of a creditor who alone has suffered by the transfer, or only at the suit of the receiver of the Cheyenne bank.

The receiver of an insolvent bank is ordinarily the party to bring suit for the purpose of having such transfers adjudged null and void. This is so because he is the officer charged with the collection of assets and debts of the bank, and the setting aside of a transfer will usually have an effect upon the amount of assets and upon their ratable distribution among the creditors.

It is to be noted, however, that section 5242 does not confer on the receiver of an insolvent national bank exclusive power to sue to have the transfers denounced by the section adjudged null and void. In fact, the section does not explicitly confer power to sue either upon the receiver or any one else. It simply denounces certain transfers as null and void, and leaves the matter there. The receiver is endowed with power, under other sections of the statute, to collect the debts and assets of the bank. He invokes the provisions of section 5242 in suing to make such collections. But there may be instances where a bank, in contemplation of insolvency, makes, or causes to be made, a transfer which it intends to result, and which does in fact result, in one creditor getting a preference over another creditor; yet without any assets being involved in which the other creditors are interested. In such a case, the receiver is not so vitally interested in the transfer as the particular creditor who claims to have been made to suffer a loss. The Omaha bank contends that this is the situation in the case at bar, and that it is entitled to maintain the suit. We think that under the peculiar facts involved this contention should be sustained.

Section 5242 (12 USCA § 91) is but a part of the National Banking Acts (12 USCA § 21 et seq.). It is the broad purpose of these acts, in respect to insolvent banks, to collect the assets; to prevent preference among creditors of the same class; to secure a ratable distribution of the assets among the creditors. Bailey v. Mosher, 63 F. 488 (C. C. A. 8); National Bank v. Colby, 21 Wall. 609, 22 L. Ed. 687; Steele v. Randall, 19 F. (2d) 40 (C. C. A. 8).

The outcome of the present suit can in no way affect the distribution of assets of the Cheyenne bank among its creditors other than the Casper bank and the Omaha bank.

The maintenance of the present suit by the Omaha bank is not impeding the liquidation of the bank in accord with the purposes stated. On the contrary, the present suit is aiding in carrying out such purposes.

The receiver of the Cheyenne bank at one time took the position in his answer that the transfer of the $60,000 to the Casper bank was but one transaction in a scheme on the part of the Cheyenne and Casper banks to prefer the Casper bank over other creditors; and he asked that the court should proceed to take the evidence and decide the issues as to the alleged scheme; but later, by an amended answer, he disclaimed any right, title, or interest in the controversy in the present suit. Still later, however, dividends have been paid by the comptroller through the receiver to one of the parties to the present suit without prejudice to rights existing under the suit—all of which shows that the maintenance of the present suit is in no wise hampering the proper liquidation of the bank.

Where a federal statute has affected substantive rights, the courts have, in numerous instances, entertained suits by individuals whose rights have been invaded, even though the statute did not specifically create a right of action in such individuals.

Illustrations are found in cases under the Safety Appliance Acts before the passage of the Employers' Liability Act; in cases under the Hours of Service Act; and under the Twenty-eight Hour Act. Other similar illustrations might be given. See, also, Texas & N. O. R. Co. v. Ry. Clerks, 281 U. S. 548, 50 S. Ct. 427, 74 L. Ed. 1034.

We think the present suit is maintainable under section 5242. If we are wrong, however, in our construction of section 5242 and in holding that the Omaha bank can, under the peculiar circumstances disclosed, maintain suit thereunder, nevertheless a similar conclusion as to the liability of the Casper bank must be reached upon considering the facts apart from any right of the Omaha bank to maintain suit under that statute.

The personal relations existing between the officers of the two banks; the insolvency of the Cheyenne bank, known both to its officers and to the officers of the Casper bank; the calling into conference of the officers of both banks; the premeditated plan of the Casper bank to withdraw its balance as soon as possible from the Cheyenne bank; the carrying out of this plan with the knowledge of the Cheyenne bank; the knowledge of the officers of both banks that the closing of the Cheyenne bank was imminent; the haste in

the transaction shown by the Casper bank's telegraphing to the Cheyenne bank to "transfer by telegraph" a $60,000 credit at Omaha; the following out of this instruction by the Cheyenne bank; the sending of the drafts on Boston to the Omaha bank with knowledge by the Cheyenne bank that its own doors would close before the drafts could be paid —all show a plan to prefer the Casper bank.

The use by the Cheyenne bank of the conditional credit created by the first Boston draft as a basis for the $60,000 transfer, knowing that the basis would fail, was a fraud on the part of the Cheyenne bank toward the Omaha bank. The latter bank promptly rescinded the transaction on account of the fraud, as soon as learned.

One defrauded of his property is not divested of title, but the transferee takes it as a trustee ex maleficio, and the owner may pursue it in a court of equity and recover it in the hands of the original wrongdoer or any subsequent holder until it gets into the hands of a purchaser in good faith and without notice. 3 Pom. Equity (4th Ed.) § 1053; 2 Perry on Trusts (7th Ed.) §§ 211, 217, 223.

Mr. Pomeroy says (section 1053):

"In general, whenever the legal title to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same, although he may never perhaps have had any legal estate therein; and a court of equity has jurisdiction to reach the property either in the hands of the original wrongdoer, or in the hands of any subsequent holder, until a purchaser of it in good faith and without notice, acquires a higher right, and takes the property relieved from the trust. The forms and varieties of these trusts, which are termed ex maleficio or ex delicto, are practically without limit. The principle is applied wherever it is necessary for the obtaining of complete justice, although the law may also give the remedy of damages against the wrongdoer."

And again at section 1058 the author says:

"The beneficiary, therefore, being the true owner, may always, by means of an equitable suit, compel the trustee to convey or assign the corpus of the trust property. * * * In such a suit the plaintiff is also entitled to any additional or auxiliary remedy, such as injunction, cancellation, accounting, which may be necessary to render his final relief fully efficient."

We think this remedy in equity of cancellation was available to the Omaha bank in the present suit quite apart from any right to sue under section 5242 (12 USCA § 91).

The burden of proof to show a "purchaser in good faith and without notice" was on the Casper bank. The burden, in our opinion, has not been sustained.

Furthermore, it is a well-established principle of law that, when a bank has become hopelessly insolvent, and its president knows that it is so, it is a fraud to receive deposits of checks from an innocent depositor ignorant of its condition, and he can reclaim them or their proceeds. St. L., etc., Ry. Co. v. Johnston, 133 U. S. 566, 576, 10 S. Ct. 390, 33 L. Ed. 683; Quin v. Earle (C. C.) 95 F. 728; Richardson v. New Orleans Coffee Co. (C. C. A.) 102 F. 785; Brennan v. Tillinghast (C. C. A.) 201 F. 609; Fid. & Dep. Co. v. Kelso State Bank (C. C. A.) 287 F. 828; Fed. Reserve Bank v. Idaho, etc. Ass'n (C. C. A.) 8 F.(2d) 922; Marvin v. Martin (C. C. A.) 20 F.(2d) 746.

While the facts in the cases cited differ from those in the case at bar, yet we think the facts in the present case bring it within the principle announced.

It is strenuously insisted that the transactions between the Casper bank and the Cheyenne bank, and those between the Cheyenne bank and the Omaha bank, were all in the ordinary course of business; and considerable testimony, as well as figures, relating to other transactions, were introduced to support this contention. The evidence has not proved convincing. We cannot think that it is the usual course of business for a bank, known by its officers to be hopelessly insolvent and about to close its doors, to request of another bank an advancement of credit, knowing that the credit will not be repaid. A fraudulent transaction does not change its character by clothing itself in the respectable habiliments of the ordinary course of business.

The case of McDonald v. Chemical National Bank, 174 U. S. 610, 19 S. Ct. 787, 43 L. Ed. 1106, is clearly distinguishable on its facts. In that case there was no allegation in the bill that the transfers in question were made in contemplation of an act of insolven-

cy, or with an intent to make a preference, and no proof to support such findings; nor did the evidence disclose any intention or expectation on the part of the officers of the insolvent bank to presently suspend business.

Finally, in our opinion, the remedy of cancellation was applicable to the transaction in toto.

The proof shows that the whole item of $60,000 was taken from the Omaha bank; whether the suit was brought under the statute or under the stated doctrines of equity, the whole of that amount should be restored. The relief afforded is to be measured, not by the $50,000 draft which was a mere instrument through which the transaction was effected, but by the amount of the transfer, which was the amount of loss suffered by the Omaha bank on account of the transaction.

Other questions in the case do not require special notice.

The decree should be modified by adjudging the transfer illegal under the statute, and subject to cancellation on that ground, and also on grounds of equity. The case will be remanded for modification of the decree in accordance with this opinion, and, as so modified, it will stand affirmed. Costs will be allowed the Omaha bank as on one appeal only.